No. 23110.

Airport Limousine Service, Inc., and Public Utilities Commission of the State of Colorado *v.* Cabs, Inc., a Colorado corporation, d/b/a Zone Cab Company; Ida Lewis, d/b/a Ritz Cab Company; and Teamsters Local Union 775.
(447 P.2d 978)

Decided December 9, 1968.

Walter M. Simon, for plaintiff in error Airport Limousine Service, Inc.

Duke W. Dunbar, Attorney General, Robert Lee Kessler, Assistant, for plaintiff in error Public Utilities Commission of the State of Colorado.

John F. Mueller, for defendants in error Cabs, Inc., d/b/a Zone Cab Co.; Ida Lewis, d/b/a Ritz Cab Co.

George T. Ashen, for defendant in error Teamsters Local Union 775.

*En Banc.*

Mr. Justice McWilliams delivered the opinion of the Court.

THIS writ of error concerns a decision of the Public Utilities Commission and the various parties to the controversy are as follows: (1) Airport Limousine Service, Inc., a Colorado corporation which will hereinafter be referred to as the applicant; (2) Cabs, Inc., a Colorado corporation, Ida Lewis, doing business as Ritz Cab Company, and Teamsters Local Union No. 775, who collectively will hereinafter be referred to as the protestants; and (3) the Public Utilities Commission of the State of Colorado, hereinafter referred to as the Commission.

The applicant is a common carrier heretofore authorized by the Commission to provide transportation for passengers and their baggage between Stapleton International Airfield and certain designated places in downtown Denver. More specifically, *prior* to the order of the Commission to which this writ of error relates, the applicant had the authority to provide two-way service between the airport and the following downtown Denver hotels: Albany, Brown Palace, Cosmopolitan, Shirley-Savoy, Oxford and Denver Hilton; and in addition thereto applicant had the right to serve the Denver Union Station. This particular certificate was referred to by the Commission as a "call and demand" type of certificate, and not a "scheduled, point-to-point service over regularly established routes." By way of explanation, service to the Oxford and the Denver Union Station was apparently always on a so-called "call and demand" basis, whereas the service to the other hotels listed above was generally, though not always, on a regularly scheduled basis. The applicant was also authorized to discharge, but not to pick up, passengers at two downtown Denver bus stops.

In 1964 applicant made application for an extension of authority to the end that in addition to its existing authority, applicant would also be permitted to discharge passengers, but not to pick them up, at *all* downtown Denver hotels and motels. The protestants appeared

and resisted this application and, after a very full hearing, the application was denied by the Commission, with the comment that the proposed extension of service was "discriminatory" in nature. The "discrimination" perceived by the Commission apparently related to the fact that the six hotels served by the applicant under its existing authority had so-called two-way service, *i.e.*, passengers were picked up, as well as discharged; whereas the many additional hotels which applicant proposed to serve would obtain only one-way service, *i.e.*, passengers would be discharged at these additional hotels, but not picked up.

Very shortly after the aforesaid application was denied, applicant filed another application in which it sought to obviate the "discrimination" discerned by the Commission. In this application the applicant sought to have an extension of authority to the end that it would be permitted to render two-way service to all *transient* hotels and motels in downtown Denver, with transient hotels and motels to be defined as those hotels and motels ordinarily reserving at least fifty rooms for the traveling public.

Hearing on this second application was thereafter held, with the protestants again appearing and resisting the application for an extension of authority. It was stipulated that all the testimony given at the earlier hearing could be considered by the Commission in connection with the second application. And at this particular hearing the applicant also called some six witnesses, with the protestants calling one. Thereafter, the Commission rendered its decision which in practical effect granted the application, though applicant did not get quite all of that which it requested. The decision thus entered was an elaborate one, consisting of some forty typewritten pages, much of it singly spaced. The Commission divided its decision into four sub-headings: procedure and record; findings of fact; discussion; and its order.

The order of the Commission as set forth in its decision is as follows:

"That Airport Limousine Service, Inc., be and hereby is, authorized to extend operations under PUC No. 2778 so that said certificate PUC No. 2778 shall henceforth be authority to provide the following transportation:

*[Paragraph No. 1]*

"The transportation of passengers and their personal baggage in limousines of rated seating capacity of twelve, including the driver, from and to the Airport Terminal Building at Stapleton Airfield in Denver, Colorado, to and from all transient hotels and motels, and all bus stations and railway stations, within an area bounded as follows:

'Commencing at 20th Street and Broadway; thence northwest along 20th Street to Wynkoop Street; thence southwest along Wynkoop Street to Speer Boulevard; thence southeast along Speer Boulevard to West Colfax Avenue; then east on West Colfax Avenue to Broadway; thence south on Broadway to 10th Avenue; then east on 10th Avenue to Logan Street; thence north on Logan Street to 20th Avenue; thence West on 20th Avenue to Broadway; thence north on Broadway to the point of beginning.'

A transient hotel or motel being defined as a hotel or motel ordinarily reserving at least fifty (50) or more rooms for the accommodation of the traveling public. and this Order shall be deemed to be, and shall be, a Certificate of Public Convenience and Necessity therefor.

*[Paragraph No. 2]*

"That the description of the operating authority of Airport Limousine Service, Inc., as hereinabove set forth, shall consolidate and supersede previous descriptions of such operating authority as contained in Commission Decisions No. 41846, No. 54250, No. 57998 and No. 58082, and that PUC No. 2778 shall hereinafter include such above set forth consolidated description, plus the oper-

ating authority transferred to Airport Limousine Service, Inc. in Decision No. 53727.

*[Paragraph No. 3]*

"That the initial service points which shall be served under the extended authority herein granted to *Airport Limousine Service, Inc.* shall be the following hotels:

| | |
|---|---|
| 1. Brown | 13. Gotham |
| 2. Hilton | 14. Hampshire |
| 3. Albany | 15. Olin |
| 4. Cosmopolitan | 16. Adams |
| 5. Shirley-Savoy | 17. Roosevelt |
| 6. Oxford | 18. Standish |
| 7. Y.M.C.A. | 19. Auditorium |
| 8. Y.W.C.A. | 20. Barth |
| 9. Diplomat | 21. Colorado |
| 10. Mayflower | 22. Crest |
| 11. Argonaut | 23. Frontier |
| 12. Cory | 24. Kenmark |

25. Stanley Plaza

and the following bus and railway stations:

1. Greyhound Terminal      2. Continental Terminal
3. Union Station

*[Paragraph No. 4]*

"That Airport Limousine Service, Inc., shall file with the Commission no later than November 30, 1966, to become effective on statutory notice no later than January 1, 1967, its Schedules of Rates, Rules and Regulations and Time Schedules for the rendition of the airport limousine service authorized by this order. Such filings shall be in compliance with the provisions of this order, the rules and regulations of the Commission and the statutes of the State of Colorado.

*[Paragraph No. 5]*

"That Airport Limousine Service, Inc. shall continue to render service to its previously authorized nine service points and shall institute experimental service to its

nineteen new service points, pending the filing of its Schedule of Rates, Rules and Regulations, and Time Schedules, as hereinabove required."

The protestants thereafter instituted proceedings to obtain judicial review of this decision of the Commission. After hearing, the trial court held that the order of the Commission was "not just and reasonable" and in support of such determination assigned the following reasons:

(1) the order failed to restrict and limit the applicant to the twenty-eight service points specifically named in the order;

(2) as to certain service points the order permits a call and demand type of service in lieu of regularly scheduled service and "makes no requirement that all service points be served on all trips"; and

(3) that the order therefore "impinges" upon the service performed by the protestants and "fails to take into account the three distinctive types of service which the Commission recognizes, namely taxicabs, limousines and tramway bus."

The trial court then proceeded to "modify" the order of the Commission in the following manner:

(1) by deleting from the Commission's order that portion which has been denominated by us as paragraph No. 1;

(2) by substituting for the deleted paragraph No. 1, the following:

"The transportation of passengers and their personal baggage in limousines of rated seating capacity of twelve, including the driver, from and to the Airport Terminal Building at Stapleton Airfield at Denver, Colorado to and from the twenty-five hotels and the bus and railway stations set out in this order;" and

(3) deleting the word "initial" which appears in the first line of that which we have labeled as paragraph No. 3 in the Commission's order.

Also, the trial court "modified" the "discussion" part

of the Commission's decision by deleting therefrom the following paragraph:

"The Commission realizes that certain of the designated twenty-eight service points will generate more business than others and therefore will need more service. Applicant may adjust the frequency of service to meet the situation. In other words, applicant is not required to furnish identical service to each of the twenty-eight service points but may adjust the frequency of service to meet the needs for service of each point, provided such frequency of service is maintained within the guidelines hereinafter set forth."

The trial court by its judgment then remanded the matter to the Commission with the direction that it remodel its decision in accordance with the modification effected by the trial court. And by this writ of error the applicant seeks a reversal of the judgment thus entered.

As indicated, both the trial court and the Commission recognized that the traveling public has three alternative means of public transportation between the airport and downtown Denver: (1) tramway bus No. 64, at a charge of 25 cents; (2) airport limousine service, at a charge of $1.25 per person, per trip; and (3) taxi service, at a charge of $2.50 per person, per trip. The Commission found that the segment of the traveling public which desired to use a tramway bus to get to and from the airport was being adequately served by existing facilities. Similarly, the Commission also found that those who desired taxi service to and from the airport were being adequately served by the existing taxicab service. However, the Commission found that those who desired airport limousine service were not being adequately served. In our view the record amply supports the foregoing findings of fact. Certainly there was much evidence that many patrons of downtown Denver hotels desired airport limousine service, and couldn't get it, or in order to get such service had to walk several blocks, with their luggage in hand, to one

of those hotels where the applicant was authorized to make a pick up. And as we understand it, the trial court's judgment did not in anywise overturn the basic finding of the Commission that public convenience and necessity required expanded airport limousine service. So, the issue is not so much *whether* the nineteen hotels and motels not previously served by the applicant are to be served under its expanded authority, but *how* and *in what manner* they are to be served.

Applicant contends that by statute the Commission has the power to prescribe reasonable rules and regulations in connection with a certificate of public convenience and necessity, and in support thereof cites C.R.S. 1963, 115-9-5 and 115-4-1. The former statute reads as follows:

" * * * The commission shall have power, under such rules of procedure governing the application therefor as it may prescribe, to issue a certificate of public convenience and necessity to a motor vehicle carrier or to issue it for the partial exercise only of the privilege sought; and may attach to the exercise of the rights granted by said certificate such terms and conditions as, in its judgment, the public convenience and necessity may require."

Also, C.R.S. 115-4-1, provides, in part as follows:
" * * * the Commission shall prescribe rules and regulations for the performance of any service or the furnishing of any commodity of the character furnished or supplied by any public utility, and upon proper tender of rates, such public utility shall furnish such commodity or render such service within the time and upon the conditions provided in such rules."

It should be observed that in connection with this statutory power to attach terms and conditions to a certificate of public convenience and necessity it was stated in *Utilities Commission v. Weicker*, 102 Colo. 211, 78 P. 2d 633 that:

"In determining this issue, as has been noted above, the

commission is clothed with general powers to regulate and control carriers for hire within the state, and courts will not interfere with its administrative rulings when they are just and reasonable. . . ."

The several "modifications" effected by the trial court should be examined a bit more closely. First, as we understand it, the trial court limited and restricted the expanded authority granted the applicant to those twenty-eight service points mentioned by name in the Commission's decision. The Commission, however, in its decision declared that these twenty-eight designated service points were to be the "initial" service points. And in the "discussion" portion of its decision the Commission clearly indicated that the applicant could add to these twenty-eight stops, but certainly not by any unilateral action on the part of the applicant. Our conclusion in this regard is based on the following language appearing in the "discussion" portion of the Commission's decision:

"As additional service points become eligible for airport limousine service under provisions of this order, applicant may add such points by filing amendments on statutory notice to Schedule of Rates, Rules, and Regulations and Time Schedules on file with the Commission. Applicant shall furnish copies of its Schedule of Rates, Rules, and Regulations and Time Schedules and all amendments thereto to all of its service points. After the filing of such Schedules of Rates, Rules, and Regulations and Time Schedules, and their approval by the Commission, Applicant shall render service pursuant to and in compliance therewith. Copies of this order shall be mailed by the Secretary of the Commission to all authorized service points."

Hence, this is not any *carte blanche* grant of authority to the applicant, as is argued here by the protestants. The initial service points are named in the order, and before the applicant could stop at additional service points it must first obtain approval of the Com-

mission. Suffice it to say, we perceive no unreasonableness in this phase of the Commission's decision, and it seems to us that the trial judge was simply substituting his best judgment as to what was fair and just under the circumstances for the considered judgment of the Commission. This he is not permitted to do. *Ephraim Freightways v. P.U.C.* 151 Colo. 596, 380 P.2d 228.

Perhaps the real bone of contention in the instant case was the "modification" effected by the trial court whereby it was determined that applicant on each scheduled trip should stop at each of the named twenty-eight service points. As above indicated, applicant's prior authority was deemed by the Commission to be of a call and demand variety. Certainly at the very least its service to the Oxford Hotel and the Denver Union Station was of the call and demand type. In connection with its expanded authority, it would appear that the applicant proposed to stop on each scheduled trip at some eight or nine service points and that it would only stop at the remaining service points upon call and demand. As we understand it, and this should be emphasized, when there was a call and demand from a service point where applicant did not customarily stop on each of its scheduled trips, the applicant did not immediately dispatch a limousine to pick up the waiting customer. On the contrary, the call and demand simply meant that on its next scheduled trip applicant would stop at the particular service point from whence the call and demand emanated.

■ The trial court declared it sought to modify the decision of the Commission in order that there would be no "impinging" by limousine service on the taxicab business. And the judge indicated that he was attempting to reach this particular goal by requiring the applicant to stop at each of the twenty-eight service points on every trip. In this regard the trial court erred in attempting to modify the Commission's decision to the end that applicant would be required to stop at every

service point on every trip. To require applicant to stop at each of the twenty-eight service points on each scheduled trip, regardless of whether there were waiting passengers, would obviously "slow up" the limousine service. The trial court under the circumstances is not permitted to "slow down" the applicant's limousine service in an effort to prevent possible impingement upon the taxicab business. It would be just as logical to require a tramway bus to stop at every corner, regardless of whether there was a passenger to be discharged or picked up.

It should be noted that although the tramway bus, the airport limousine and the taxicab in one sense perform the same service, *i.e.*, transportation between the airport and downtown Denver, still in a very real sense each performs a different service from the other. And the preference of the traveling public varies. Some apparently prefer the cheaper transportation afforded by a tramway bus, even though less convenient. Others want the obvious advantages afforded by taxicab service, and are willing to pay the price for such service. And, according to the record, a sizable segment of the traveling public desires airport limousine service. The needs of this latter group are not now being met, according to the findings of the Commission, and by its decision, the Commission has attempted to meet the demand therefor.

Whether the granting of this application will take business away from the taxicab business only time will tell. The evidence on this point was in conflict. But it should be emphasized that this is not an instance where a new taxicab company is trying to get into the taxicab business. If that were the case, then the argument that the existing cab companies are adequately meeting the demand for taxicab service would have merit. But such is not the case. Rather, this is an instance where applicant seeks to be allowed to meet the presently unfilled demand for a particular type of

service, namely, airport limousine service. And it is no answer to simply say that the existing taxicab service is adequate to meet the needs of those who prefer taxicabs to airport limousines or tramway buses. For, as was observed by the Commission, if this argument be valid, then "messages would still be sent by Pony Express and passengers would still be transported by stage coach."

The judgment is reversed and the cause remanded to the trial court with the direction that it vacate its judgment and enter a judgment approving the decision of the Commission.