No. 24236.

COLORADO MUNICIPAL LEAGUE, A CORPORATION, AND CITY AND COUNTY OF DENVER, A MUNICIPAL CORPORATION *v.* PUBLIC UTILITIES COMMISSION OF THE STATE OF COLORADO; HOWARD S. BJELLAND, EDWIN R. LUNDBORG, AND HENRY E. ZARLENGO, COMMISSIONERS; AND THE MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, A CORPORATION.

(473 P.2d 960)

Decided June 29, 1970. Opinion modified and as modified rehearing denied September 14, 1970.

190

GORSUCH, KIRGIS, CAMPBELL , WALKER AND GROVER,

LEONARD M. CAMPBELL, KENNETH G. BUECHE, for plaintiff in error Colorado Municipal League.

MAX P. ZALL, City Attorney, BRIAN GORAL, Assistant, for plaintiff in error City and County of Denver.

DUKE W. DUNBAR, Attorney General, ROBERT LEE KESSLER, Assistant, WARREN D. BRAUCHER, Assistant, JOHN E. ARCHIBOLD, Assistant, for defendants in error Public Utilities Commission of the State of Colorado and the members thereof.

AKOLT, SHEPHERD, DICK & ROVIRA, LUIS D. ROVIRA, DENIS G. STACK, for defendant in error The Mountain States Telephone and Telegraph Company.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

ON April 2, 1968, defendant in error The Mountain States Telephone and Telegraph Company (referred to herein as Mountain Bell) filed an application before the defendant in error Public Utilities Commission of the State of Colorado (referred to as the Commission). This application asked that for the first time since 1953 the Commission determine: the fair value of Mountain Bell's property devoted to Colorado intrastate telephone service; a fair, reasonable and adequate rate of return to be applied thereto; and the resulting amounts of net earnings and revenues required in the future.

Hearings were held upon the application at which the plaintiffs in error (herein referred to as protestants) appeared. The hearings before the Commission consumed a total of 23 days. The record before us consists of 25 volumes containing nearly 4,000 pages; plus voluminous exhibits. The Commission made the requested determinations, some of which were adopted by a 2 to 1 vote; and

the protestants obtained a review in the district court. That court affirmed the action of the Commission, and the protestants sued out writ of error here.

Mountain Bell operates in several states in addition to Colorado. Throughout this opinion references to property and dollar amounts are those relating only to the Colorado intrastate operations of Mountain Bell.

The Commission determined that 1967 should be the test year upon which it should base its findings and orders. In most cases the figures used in this opinion are averages for the test year or are account balances as of December 31, 1967. The Commission determined that the rate base should consist of the following:

| | | |
|---|---|---|
| Average plant in service | | $364,579,041 |
| Average property held for future use | | 225,927 |
| Average materials and supplies | | 1,722,288 |
| Average plant under construction | | 10,089,155 |
| Total | | $376,616,411 |
| Less: | | |
| Average accumulated reserve for depreciation | $66,854,035 | |
| Adjustments reflecting intrastate-interstate separations procedures | 2,037,572 | |
| | $68,891,607 | 68,891,607 |
| Rate Base | | $307,724,804 |

The Commission found the 1967 revenue, expense and net operating income of Mountain Bell to be as follows:

| | |
|---|---|
| Revenue | $119,460,776 |
| Expense, including taxes | 97,332,709 |
| Net operating income | $ 22,128,067 |

The Commission further found that $23,079,360 would have been a fair and reasonable net operating income for 1967. This would have been realized by applying a 7.5% rate of return to the rate base. Therefore, the Commission established the rate of return at 7.5%.

The amount realized for net income by the 7.5% rate of return is an after-taxes figure. To convert this rate of return into a before-taxes percentage the rate is multiplied by a factor of 2.0816. Therefore a 7.5% return after taxes involves a 15.612% rate of return before taxes.

The following six issues have been presented to this court for determination and will be considered in the order mentioned:

I — Whether the Commission should have imputed the use by Mountain Bell of a method of accelerated depreciation.

II — Whether in the determination of rate base funds expended for plant under construction should be included.

III — Whether in the determination of the rate base the cost of materials and supplies on hand should be included.

IV — Whether the rate of return should be 7.5% or 7%.

V — Whether additional revenue of $1,207,757 was properly allowed by reason of abnormal inflation.

VI — Whether any portion of a municipal franchise tax should be surtaxed to customers located in the municipality.

One member of the Commission dissented with respect to issues numbered I and V and as to issue number IV concluded that the rate of return should be 7.33%. We find an abuse of discretion by the majority of the Commission with respect to its resolution of issues I and V and therefore reverse. We affirm its resolution of the remaining four issues.

I — ACCELERATED DEPRECIATION

We hold that the Commission abused its discretion in not imputing tax benefits which would have accrued to Mountain Bell had it availed itself of an accelerated method of depreciation under § 167 of the Internal Revenue Code. We predicate this ruling upon the Commission's finding that the use of accelerated depreciation methods under § 167 would be of benefit both to Mountain Bell and to its ratepayers. We deem it appropriate prelimi-

narily to discuss the factual and legal setting in which this matter was presented to the Commission.

Prior to 1954, straight-line depreciation was the only method permitted under the federal laws relating to income tax. In 1954, § 167 was enacted permitting a taxpayer to use any of three methods of depreciation: (1) straight-line; (2) double declining balance; and (3) sum-of-the-digits. The second and third methods involve accelerated tax depreciation, i.e., during the early years of the depreciable life of an asset greater depreciation is permitted than that allowable under the straight-line method and, as no more than 100% of cost can be depreciated, the rate of depreciation during the remaining depreciable life of the item is less than straight-line.

The Bell System consists of a number of regional telephone companies having American Telephone & Telegraph Company as their parent company. The parent company owns in excess of 86% of the entire stock of Mountain Bell. The policy of the parent company has been and is that none of the operating companies in the Bell System should use accelerated depreciation. This is in contrast to the policies of many other utilities which now use accelerated depreciation methods.

When a public utility uses accelerated depreciation — or when the regulatory agency imputes accelerated depreciation to the utility — one of two accounting procedures can be used, viz., the normalization method or the flow-through method. Under the normalization method a reserve account is created, and the difference between the amount of income taxes payable if the straight-line method were used and the amount of taxes actually paid by use of accelerated depreciation is put into the account. This reserve is for use in the payment of income taxes during the sunset years of the depreciable life of the property involved. The effect of the normalization method is to give the utility use of additional money with a resulting reduction of the amount of money which must be borrowed by the utility. The method therefore reduces

a certain amount of interest payments. Under this normalization method telephone rates are relatively unchanged and the benefits accrue to the utility's stockholders rather than to its customers.

■ Under the flow-through method the benefit of reduced expenses is passed along to the customers in the form of reduced rates. In its findings relating to investment tax credit under the Internal Revenue Code, the Commission stated that "the benefits of this tax credit are more appropriately flowed through to the benefit of ratepayers over the service life of the property. . . . " While the Commission did not expressly find that the flow-through method would be used if accelerated depreciation were imputed, such an implication is to be found in a number of its other findings. It is significant that the Commission adopted the flow-through method for rate making purposes with respect to the Public Service Company of Colorado (Commission Order dated May 27, 1969 in application No. 17,406). Therefore, we treat this matter as if the Commission had made an express finding that on imputation of accelerated depreciation the flow-through method is to be used.

■ Counsel for Mountain Bell argue that accelerated depreciation results in tax deferral but not in tax savings. However, a tax saving does result from the use of accelerated depreciation as long as plant addition equals or exceeds plant retirement, and the Commission so found. This has been held as a matter of law. *Midwestern Gas Transmission Co. v. Federal Power Commission,* 388 F.2d 444, *cert. denied,* 392 U.S. 928, 88 S.Ct. 2286, 20 L.Ed. 1386; and *Alabama-Tennessee Nat. Gas Co. v. Federal Power Commission,* 359 F.2d 318, *cert. denied,* 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78. The Commission further found that "there is every expectation that new plant will be constructed [by Mountain Bell] at a high rate in the future."

The Commission found that, if Mountain Bell had commenced use of accelerated depreciation in 1954, the

income taxes attributable to its intrastate Colorado operations for the test year of 1967 would have been reduced by more than $3,000,000. It further found that if accelerated depreciation had been taken in 1967 on only the assets which were acquired and qualified during that year, the tax benefits would have amounted to $446,572. The evidence showed that, if Mountain Bell had adopted an accelerated depreciation method in 1954, its tax savings on its Colorado intrastate operations through 1967 would have been in excess of $24,000,000.

The Bell System's operating company in California is The Pacific Telephone & Telegraph Company. In keeping with the policy of the parent company, it used straight-line depreciation. The same issue was presented to the California Public Utilities Commission as was presented to our Commission and it ordered the imputation of an accelerated method of depreciation. Re The Pacific Telephone & Telegraph Company, 77 P.U.R.3d 1. To illustrate the magnitude of this policy in the Bell System, the California Public Utilities Commission found that, if the utility had used accelerated depreciation during the period 1954-1967, its ratepayers would have saved $450,000,000 in rates. Also, in the test year of 1967, the company would have saved $27,400,000 in taxes with a resulting increase in gross revenues of approximately $57,000,000.

With this preface, we now address ourselves to the pertinent findings of the Commission here relating to accelerated depreciation. These findings were as follows: "Second, there is no doubt in the minds of this Commission, from the record herein, that using accelerated depreciation methods under Section 167 of the Internal Revenue Code would be of benefit to the Applicant and its ratepayers alike. The rebuttal testimony presented by Applicant in no way indicated that this was not so. Mr. Kesselman, independent expert witness, testified mainly on the relative merits of flow-through or normalization accounting. It is undisputed, however, that the aggregate tax benefits continue to increase under the

conditions where new plant is added by a utility every year at a relatively high rate. Certainly in the case of the Applicant and its Colorado operations there is every expectation that new plant will be constructed at a high rate in the future. Applicant's Exhibit No. 61 indicates that invested capital is expected to grow at a minimum compound rate of 6.9% per year. By the use of accelerated depreciation methods for tax purposes, which are optional ' under the Internal Revenue Code, Applicant could, therefore, not only offset the effects of inflation, but probably reduce its costs far beyond any allowance for attrition that might be suggested. As a comparison, Protestant's Exhibit A shows that if accelerated depreciation had been used since 1954, income taxes attributable to Applicant's intrastate Colorado operations would have been reduced in 1967 by more than 3 million dollars; whereas the Applicant suggested an allowance for attrition of less than one-half million dollars a year. Even if Applicant's estimates of the impact of 1968 and 1969 wage increases should be included, which we would not consider proper in any event, the total possible attrition is less than the total possible tax benefits mentioned. Protestant's Exhibit A, which was prepared by Applicant, further shows that if accelerated depreciation would have been taken in 1967 only on those assets which were acquired and qualified during 1967, the tax benefits would amount to $446,572. This benefit could be derived without the necessity of obtaining permission from the Internal Revenue Service to change accounting procedures. Furthermore, it should be noted that this figure arises from taking only one-half year depreciation on the assets acquired during the current year, and this figure would necessarily be approximately three times larger in the following year, as tax benefits are derived from assets added in two separate years, and would continue to grow in subsequent years as the process is continued."

It would logically follow from these findings that an accelerated method of depreciation would be imputed to

Mountain Bell. However, the Commission did just the opposite, using the following language:

"The Applicant has not taken advantage of the provisions of Section 167 of the Internal Revenue Code regarding accelerated methods of depreciation for tax purposes, and this Commission will not in this proceeding impute any tax benefits that might have accrued had Applicant used the provisions of accelerated depreciation.

* * *

"We strongly believe that further study of these matters should be made by the Applicant before another proceeding involving these same issues should be instituted by the Applicant before this Commission."

The single reason given by the Commission for not ordering the imputation of accelerated depreciation is contained in its following language:

"As a separate adjustment, Staff Exhibits Nos. 4 and 7 show the pro forma effect on net operating earnings if Applicant had taken accelerated depreciation deductions for tax purposes under Section 167 of the Internal Revenue Code. Applicant has, however, not used accelerated depreciation for tax purposes, and consequently, we do not deem it proper to impute the estimated benefits to operating earnings without considering the far reaching effects that this might have. The record, of course, fully discloses that the use of accelerated depreciation for tax purposes would have decreased the income taxes payable by Applicant for the test year 1967. On the other hand, it appears that there might be the added risk to the common equity holder that an increase may occur in the federal income tax sometime in the future, even though a possibility of an increase may be based on several contingencies that cannot even be foreseen at this time. Since our rate of return determination will be based on the actual cost of capital to the Applicant under existing conditions, it would be improper to impute any tax benefits that might impose additional risk to Applicant's business without making adjustments in the

capital costs. There is no evidence in the record that would permit us to make such an adjustment in the cost of capital."

Paradoxically, after having found that there might be some added risk to Mountain Bell, the Commission proceeded to find that there was no evidence showing that there would be any risk:

"The reasons for not using this advantageous provision in the income tax law by the Applicant have not been sufficiently explained in this record. Neither has it been shown in this record to what extent, if any, the risks to investors would be increased under more aggressive policies with respect to increased debt ratio and the use of accelerated depreciation."

Before reaching the last quoted antonymous finding, the only reservation the commission appeared to have in mind was that, if federal income tax should increase sometime in the future, there would be an added risk to Mountain Bell. The discussion of impropriety of imputing tax benefits without making adjustments in capital cost is simply the construction and destruction of a straw man. There was no evidence that taxes are going to increase, no evidence of the extent of the speculative "added risk," and no evidence as to the extent of adjustment in cost of capital to compensate for the speculative tax increase.

A highly qualified expert, Mr. Melwood W. Van Scoyoc, testified that it is a fundamental concept of utility regulation that the utility should receive its fair return free and clear of all taxes. We find it difficult to disagree with Mr. Scoyoc's following remarks:

"The allowed fair return is after taking into account the cost of all taxes. The customers of a utility are specifically required to carry the burden of taxes. In substance and equity, the customers of the utility are the tax payers even though the utility files a tax return and issues the check to the taxing authority. The utility is

basically a conduit for the collection of taxes along with its other costs from its customers.

* * *

"In my opinion, the very fact that tax laws have changed in the past and the possibility of future changes exist, it is, in reality, a sound basis for the use of actual taxes in setting rates. Throughout our history of rate regulation, actual taxes have been used in rate determinations, although changes have occurred from time to time in our tax laws. As I see it, there is no valid reason why this practice should not be continued. Today's ratepayers should pay the taxes assessed today by our government, while future ratepayers should pay the taxes assessed by the government at that time. I see no justification whatsoever for ratepayers having to pay now for future income taxes on the theory that Section 167 of the Internal Revenue Code might be repealed or modified in the future."

██ The Public Utilities Law of Colorado was designed to permit an adjustment of rates in order to prevent the hazard of risk of an increase in taxes and to make savings for the ratepayers in case of a decrease in taxes. C.R.S. 1963, 115-3-1 *et seq.* The second sentence of the cited statute provides, "Every unjust or unreasonable charge made, demanded or received for such rate, fare, product or commodity or service is hereby prohibited and declared unlawful." In the light of the findings made by the Commission in this matter, it would appear that its order with respect to accelerated depreciation results in unreasonable charges to the customers.

█ Mountain Bell argues that, since the federal law gives the taxpayer a right to choose the method of depreciation to be used, the imputation of a method not chosen by the taxpayer is beyond the power of the Commission. It is true that some courts and some commissions have subscribed to the view that it is improper to require a utility to use a particular method of depreciation when the law permits the use of any of several methods. See,

*e.g., City of Pittsburgh v. Pennsylvania Public Utility Commission,* 187 Pa. Super. 341, 144 A.2d 648. In the light of the Commission's finding that the use of accelerated depreciation would benefit the customers and in the light of the statutory requirement already quoted that a utility must not make unreasonable charges, we prefer to follow authorities to the contrary and rule that the Commission not only has the power but also the obligation to impute a method of depreciation which will reasonably permit a substantial saving to ratepayers. See *Southern New England Telephone Company,* 78 P.U.R.3d 504 and cases therein cited.

Mountain Bell presents the related argument that the method of depreciation to be used is a decision to be made by management and, therefore, is beyond the purview of the Commission. In the following language to be found in *Re The Pacific Telephone and Telegraph Company, supra,* one might substitute "Mountain Bell" for "Pacific":

"Pacific, as does the rest of the Bell System, uses the straight-line method for tax purposes as well as for book purposes. Its policy is exactly that of its parent. It refuses to use an accelerated method and is adamant in its position that the election not to use accelerated depreciation is one of management prerogative alone and, further, that there is no basis in law for this commission to upset management's judgment."

We are thoroughly convinced that the Bell System in general and the Mountain Bell in particular is possessed of skilled, well-trained, extremely intelligent personnel in its varied fields of management. Courts and commissions should respect the decisions of management and, in general, not succumb to the temptation of assuming the role of management. However, no matter how much deference we have and should have for highly-trained management, when that management abuses its managerial discretion to the detriment of its customers, our regulatory commissions have a duty to declare the abuse

and make such orders as will give to ratepayers the advantage of those economies of which management has failed to avail itself. *Midwestern Gas Transmission Company v. Federal Power Commission, supra; Alabama-Tennessee Nat. Gas Co., supra;* and *Re Pacific Telephone & Telegraph Company, supra.*

On reading this opinion one might conclude that we believe, from studying the record, that Mountain Bell should use an accelerated method of depreciation. Our decision must not be predicated upon any such conclusion; actually, it is for the Commission — and not for us — to make such a finding. However, we have jurisdiction to determine whether an order of the Commission is reasonably commensurate with its findings. *Parrish v. Public Utilities Commission,* 134 Colo. 192, 301 P.2d 343; *United Transit Company v. Nunes,* 99 R.I. 501, 209 A.2d 215; *Carolina Aluminum Co. v. Federal Power Commission,* 97 F.2d 435. In the instant matter the Commission found the necessity for and the desirability of the use of accelerated depreciation. After that finding it abused its discretion and was derelict in its duty by not ordering such a method of depreciation to be imputed.

Our opinion of necessity is predicated upon the provisions of the Internal Revenue Code as they existed at the time the Commission held its hearings. The effect of any subsequent amendments to the Code should first be considered and determined by the Commission.

II — PLANT UNDER CONSTRUCTION

The protestants object to the inclusion within the rate base of funds invested by Mountain Bell in plant under construction. The principal ground for this objection is that these portions of the plant are not producing revenue. They further object to the capitalization of interest at the rate of 5% on funds invested in plant under construction so that at the end of the year the aggregate of this interest will become a part of the rate base. Historically, Mountain Bell has been permitted to include plant under construction funds as a part of the rate base,

although in this proceeding the Commission's staff recommended that such outlays be eliminated. The recommendation was rejected by the Commission. Also historically, Mountain Bell has credited income with an amount equal to the interest charged during construction. The crediting of income with this interest to a substantial extent offsets amounts realized from the rate of return on the capitalized interest.

State public utilities commissions have reached varying conclusions with respect to inclusion of plant under construction and interest thereon in the bases. For example, see *Re Northwestern Bell Telephone Company,* 77 P.U.R.3d 215 (S.D.); *Re Pacific Telephone and Telegraph,* 53 P.U.R.3d 513 (Calif.); and *Re Southern Bell Telephone and Telegraph Company,* 66 P.U.R.3d 1 (Fla.). The Federal Communications Commission in substance has approved an accounting procedure similar to that approved by the Commission for Mountain Bell. *Re American Telephone and Telegraph Company,* 71 P.U.R.3d 273. Our attention has been called to no case, and we have been unable to find any case, in which a court has overruled the decision of a commission with respect to these matters. We regard the whole plant under construction issue as one within the province of the Commission and we believe that any change in the Commission's order in this respect would be an unwarranted interference with the function of the Commission. In other words, we would be setting ourselves up as the Commission if we reversed as to this matter. *Airport Limousine Service, Inc. v. Cabs, Inc.,* 167 Colo. 378, 447 P.2d 978.

### III — MATERIALS AND SUPPLIES

Mountain Bell asked that working capital and the cost of materials and supplies on hand be included in the rate base. The Commission permitted the inclusion of the average of materials and supplies in the amount of $1,722,288. It refused to grant any allowance for working capital for the reason that Mountain Bell's accrued

taxes were a larger sum on an average basis than the amount of cash working capital needed, and that the reserve for taxes could be used as working capital.

The protestants urged that the tax accruals were sufficient additionally to finance the cost of materials and supplies and therefore asked that materials and supplies also be eliminated from the rate base. Some public utilities commissions have excluded materials and supplies, as well as working capital, from the rate base when the tax accruals have been substantially in excess of these items. *Ex parte Gulf States Utilities Co.,* 46 P.U.R.3d 294 (La.); *Re Otter Tail Power Company,* 49 P.U.R.3d 305 (N.D.); and *Re The Orwell Telephone Company,* 61 P.U.R.3d 460 (Ohio). In contrast other commissions, while excluding working capital, have permitted the inclusion of materials and supplies in the base. *Re Southwestern Bell Telephone Company,* 2 P.U.R.3d 1 (Ark.); *Re Pacific Telephone & Telegraph Company,* 53 P.U.R.3d 513 (Cal.); *Re Pacific Telephone & Telegraph Company,* 17 P.U.R.3d 434 (Ore.); and *Re Northwestern Bell Telephone Company,* 77 P.U.R.3d 215 (S.D.) In past rate orders Mountain Bell has been permitted to include materials and supplies in the base. Then and now the allowance of this item is within the Commission's judgment and discretion; it is beyond our purview. *Duquesne Light Co. v. Pennsylvania Public Utilities Commission,* 107 A.2d 745 (Pa.).

## IV — RATE OF RETURN

Prior to the proceedings under review, the rate of return last allowed to Mountain Bell was 6.69%. This was established by order in 1953, effective January 1, 1954. The protestants ask that we reverse the Commission with respect to its allowance of a 7.5% rate of return and that we order the Commission to confine the rate of return to 7%.

In its findings the Commission made the following pertinent observations concerning rate of return: "The difference between revenues and expenses is the

net operating income of the utility which produces the return on rate base. The rate of return in percent may be computed by dividing such net operating income by the rate base. The rate of return is a crucial determination, as it is the dollars produced by this rate of return that compensate the utility for its costs of capital. The costs of capital consist of interest on long term debt and associated expenses of debt service (fixed charges), costs of preferred stock, if any, with the balance of net operating income being available to the common equity investors. This balance must be such that capital may be attracted on reasonable terms and must therefore be sufficient to provide for a reasonable and adequate dividend, for a reasonable accumulation of surplus, and for the maintenance of the financial integrity of the utility. The total revenue requirements then consist of all the expenses that may be determined proper, including adjustments, and the above mentioned return on capital costs."

The foregoing might be characterized as a condensation of the excellent expositions to be found in *Bluefield Waterworks and Improvement Co. v. Public Service Commission*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 and *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333. Counsel for Mountain Bell appropriately defined rate of return as "the percentage by which a utility's rate base is multiplied to determine the wages of capital."

Inherent in fixing a rate of return is a determination of "debt cost," *i.e.*, interest paid and other expenses incident to the utility's indebtedness. A determination must also be made of a reasonable return to the stockholders of the utility; and we will refer to such return as "equity cost." In the computation of rate of return, both costs must be incorporated on a weighted ratio. If the amount of debt were equal to the value of the stockholders' equity and if the debt cost were 6%

and a reasonable equity cost were 10%, then the calculated rate of return would be 8% computed as follows:

| Type of Capital | Capital Structure | Cost of Capital | Proportional Cost |
|---|---|---|---|
| Debt | 50% | 6% | 3% |
| Equity | 50% | 10% | 5% |
| Overall rate of return | | | 8% |

In contrast, if the debt ratio were only 20% the calculated rate of return would be 9.2% computed as follows:

| Debt | 20% | 6% | 1.2% |
|---|---|---|---|
| Equity | 80% | 10% | 8.0% |
| Overall rate of return | | | 9.2% |

 "Debt ratio" is the percentage of debt in the capital structure. The debt ratio of all of the companies in the Bell System is an average approximately of 35%, and the parent company is seeking to achieve a debt ratio for the operating companies of 40%. However, the debt ratio of Mountain Bell in 1967 was only 29%. The equity, constituting approximately 71% of the capital structure, was found by the Commission to be 11,304,429 shares of common stock applicable to the Colorado intrastate operations. These shares had an average book value of $18.65 per share. We should mention parenthetically that the Commission rejected Mountain Bell's request for valuation of property under a "present value" theory, and the Commission adopted the principle of original cost less "the actual accumulated provisions for depreciation (allocated depreciation reserve)." The average interest rate paid by Mountain Bell on its indebtedness at the end of 1967 was 4.59%, varying on different issues of debentures from 2.59% to 6.04%.

Three witnesses testified with respect to rate of return: Dr. Burton A. Kolb, a professor of finance at the School of Business at the University of Colorado, who appeared as a witness for Mountain Bell; Mr. James W. Heckman, a Mountain Bell vice president; and Mr. David A. Kosh

of Washington, D. C., a witness for the Commission staff. Both Dr. Kolb and Mr. Heckman predicated their opinions upon comparable rates of return of industrial companies. Dr. Kolb recommended a rate between 7.5% and 8.5% of "present value." Mr. Heckman expressed the opinion that the equity cost should be 13%. He applied a hypothetical debt ratio of 40%, *i.e.*, an additional 11%, and placed the interest cost for this additional indebtedness at 5.42%. He recommended a rate of return between 9% and 10% based upon the following computation:

| Type of Capital | Capital Structure | Cost of Capital | Proportional Cost |
|---|---|---|---|
| Debt | | | |
| Present | 29% | 4.59% | 1.33% |
| Additional | 11% | 5.42% | .60% |
| Equity | 60% | 13.00% | 7.80% |
| Overall rate of return | | | 9.73% |

Mr. Kosh used a hypothetical debt ratio of 50% with an average interest cost of 4.81%, and stated that he would allow a 9% equity cost. He recommended a 7% rate of return based upon the following computations:

| Type of Capital | Capital Structure | Cost of Capital | Proportional Cost |
|---|---|---|---|
| Debt | 50% | 4.81% | 2.4% |
| Equity | 50% | 9.00% | 4.5% |
| Overall rate of return | | | 6.9% |

Mr. Kosh stated that at the 7% rate and with the 50% debt ratio the Colorado intrastate operations of Mountain Bell could withstand a depression more severe than that of the 1930's.

The Commission in large part rejected the testimony of Dr. Kolb and Mr. Heckman because it found that in this respect industrial companies are not comparable to regulated monopolies such as Mountain Bell. Additionally, as previously indicated, the Commission rejected

the "reasonable value" theory of valuation of property used by Dr. Kolb in his computation of rate base.

In its findings the Commission related its 7.5% rate of return to the situations developed by the expert witnesses. It found that by using the actual 29% debt ratio this rate would produce a 9.2% return on equity, which is comparable to the equity cost favored by Mr. Kosh. It found that, by applying Mr. Heckman's 40% debt ratio and additional debt cost of 5.42%, the 7.5% rate of return would realize a return for equity of 9.28%. Applying the 7.5% rate of return to Mr. Kosh's hypothetical structure of 50% debt ratio and average interest cost of 4.81%, it calculated return on equity to be 10.2%. In effect, it found these equity costs under the 7.5% rate of return to be reasonable in each of the computed examples.

Counsel for the protestants have presented the following argument: Since the Commission rejected the testimony of Dr. Kolb and Mr. Heckman, the only testimony remaining upon which the Commission can base its rate of return was that of Mr. Kosh. Thus, they contend, in allowing the 7.5% rate of return instead of the 7% rate recommended by Mr. Kosh, the Commission reached a conclusion not supported by the evidence.

The fallacy of this argument is that the Commission must adopt *in toto* the recommendations of Mr. Kosh. The Commission had an obligation to arrive at a rate of return consonant with its statement of definition and objectives contained earlier in this opinion. In this most voluminous record and among the many exhibits is to be found ample, competent evidence to support the Commission in its findings relating to rate of return. The determination of this end result is not an exact science. The Commission, in addition to the consideration of arithmetical figures and algebraic equations, must evaluate the effect of a large number of factors. This evaluation flows as a stream bounded on each side by the limits of discretion. We hold that the Commission in fixing this rate of return stayed within its discretionary

channels. Some or all of the members of this court may feel that the Commission should have evolved the 7% rate; but to do so involves the transmutation of this body from a court to a commission. To quote the apt words of our brother Kelley:

"The determination of the *rate of return*, like the fixing of rates, involves many questions of discretion and judgment, which, as we pointed out above, is the task of the Commission and not the courts. So, if the findings of fact on which the rate of return is founded have a legally adequate basis in the evidence and pass the constitutional tests heretofore outlined, the courts cannot disturb the Commission's determination." *Public Utilities Commission v. Northwest Water Corp.*, 168 Colo. 154, 451 P.2d 266.

Reference is made to the last paragraph of our following discussion on the subject of abnormal inflation. Conceivably, this may require some reduction by the Commission of the 7.5% rate of return.

### V — ABNORMAL INFLATION

 The Commission allowed Mountain Bell additional annual revenue of $1,207,757 (1% "of total revenue requirements based on the 1967 test year") to compensate for abnormal inflation.

The Commission found that, since its order in 1953 allowing a 6.69% rate of return, Mountain Bell's earnings had not eroded by reason of attrition. It appears that the words "attrition" and "inflation" as used by the Commission in this connection mean the same thing. The following is the finding of the Commission as to attrition:

"Column L, Applicant's Exhibit 23, proposes an adjustment of allowance for attrition. Attrition is defined as erosion in the rate of return. This erosion occurs when inflation or other economic forces cause the expenses or investment or both to increase at a faster rate than revenues. The evidence in this record clearly demonstrates that this has not been the case with respect to

Applicant's Colorado intrastate operations. The rate of return since the 1953 rate case before this Commission, Decision No. 41363, Application No. 12292, has almost every year since 1955 been in excess of the 6.69% rate of return that was used by the Commission in 1953 to determine the revenue requirements of the Applicant and the rates necessitated thereby. There has been some testimony by Applicant's witnesses that attrition may take place in the future. With the record before us, however, which illustrates a perfect lack of attrition in terms of erosion in the rate of return since the last rate case, in spite of several rate *reductions* in the interim period, it is inconceivable to us how an allowance for attrition either in a dollar amount or in the rate of return could be supported at this time. This does not mean that we do not recognize the inflationary economic forces that have taken place in the economy and that affect telephone utilities, but rather that the normal forces of inflation have been effectively and completely offset by good management, efficient operations and increased usage of telephone services."

The Commission further found that there was abnormal inflation during 1967 and used this as a basis for its order allowing the increase in revenue. Its findings and comments were as follows:

"Our discussion regarding attrition or erosion of earnings, however, refers only to a more 'normal' rate of inflation such as has taken place over the period of years since 1953. On the average, the Gross National Product deflator index during this period 1953-1967 has grown at a compound rate of 2.1% a year, while the increase since 1965 has been at a rate of 3.1% a year. It takes approximately a year to complete a major rate case such as the instant proceeding and put new rates into effect. On this basis, it is the finding of the Commission that while inflation at an average rate of about 2.1% annually has not and will not result in a gradual attrition of Applicant's earnings, the recent abnormal price inflation

at a rate of 1% higher than the fourteen-year average necessitates an adjustment of revenue requirements in the magnitude of 1% to do no less than compensate for the unavoidable lag in putting new rates in effect.

"Nor is the abnormal inflation reflected solely in the so-called Gross National Product deflator index. Similar unusual increases are reflected in other indices, which lend sufficient credence to our conclusion. For instance, the Consumer Price Index in the period 1953 to 1967 changed by 27.6 points from 111.2 in 1953 to 138.8 in 1967; 7.7 points, or 28% of this increase occurred in the last 2 years (1965-1967). Similarly, the Wholesale Price Index increased from 92.7 in 1953 to 106.1 in 1967, an increase of 13.4 points in 14 years, while the increase from 1965 to 1967 was 3.6 points, or 27% of the total 14-year increase. It is common knowledge that the recent accelerated inflationary trend has not yet been reversed.

"Accordingly, we have found that a special adjustment is necessary under the particular circumstances at this time. This adjustment which at this time should no more than counteract the necessary 'regulatory lag' of approximately one year before new rates can become effective, is necessary so that the relationships of rate base, revenues and expenses for the 1967 test year, as adjusted herein, would continue for the foreseeable future, barring a recurrence or continuance of an inflationary trend of recent magnitude."

In another portion of its order, the Commission stated:

"The unusually high rate of inflation in the general economy is presently well above the average rate of inflation during the fourteen years since the last rate case involving Applicant before this Commission in 1953. Accordingly, we find that an additional adjustment for revenue requirements to compensate for economic inflation is necessary at this time to the extent of one percent (1%) of the total revenue requirements based on the 1967 test year, or $1,207,757 ...."

The Commission's action in granting this allowance

was by a two-to-one vote. As mentioned by the dissenting commissioner the facts do not support a conclusion that Mountain Bell was adversely affected by abnormal inflation in the test year. The majority predicated its award upon the facts that nationally throughout the economy the average inflation was 2.1% annually during the period 1953-1967, while in the period 1966-1967 it was 3.2% and during the test year of 1967 it was 3.1%. As indicated in the dissent, justification of such an award must be predicated upon a showing that the general "abnormal inflation" found by the Commission had an adverse effect on Mountain Bell. On the contrary, the record reflects that Mountain Bell's average rate of return for the 2-year period 1966-1967 was 6.775%, and that its rate of return was 6.91% in 1967. The authorized rate of return for these years was 6.69%.

The record is devoid of any evidence showing a need for $1.2 million by reason of abnormal inflation in 1967. Considering the Commission's positive finding that Mountain Bell was not suffering from attrition and the lack of any evidence that it was suffering from abnormal inflation in 1967, this award is arbitrary and capricious.

### VI — MUNICIPAL FRANCHISE TAX

One of the exhibits is a list of 92 towns and cities in Colorado to which Mountain Bell paid franchise, license or occupational taxes in 1967. Some of these municipalities charged flat payments and a few collected license fees. The great bulk of the municipalities charged a percentage of subscriber revenue accounts. Most of the towns and cities had a tax of 2% of the accounts. A few had 1%. Four cities, including the City and County of Denver, had a tax of 3% of the accounts, but none had a tax greater than 3%.

Mountain Bell's Colorado vice president and general manager urged that Mountain Bell be permitted to add the taxes of a particular municipality to the bills of the customers in that town or city and thereby eliminate discrimination against customers not residing within the

limits of a taxing unit. The Commission found that such taxes are common and are normally designed to compensate the municipality for the use of its streets and alleys by the utility. Implied in its findings is the conclusion that if the tax is reasonable it is not discriminatory. The Commission stated:

"A problem arises when such taxes exceed the bounds of reasonableness and become solely a method for raising revenue for general municipal purposes. * * * We have, therefore, concluded that a franchise and license tax of not more than three percent is a reasonable charge for the use of municipal streets and alleys, but we feel that any part of a franchise or tax in excess of three percent of revenue should be properly surcharged to the customers located within such municipality and upon whose revenues such tax is levied."

Without citing any cases counsel for the protestants object to the surcharge of municipal franchise taxes in excess of 3% of revenues. They urge that under no circumstances should these taxes be surcharged. In any event, they say, a limitation upon such taxes charged to the general expense should not be made until a hearing in depth is held and detailed evidence is taken. We are puzzled slightly by the arguments of the protestants on this issue. Denver and the other members of the Colorado Municipal League — and the customers living within their boundaries — are not affected as no municipality is over the 3% limitation. It occurs to us that the objection to this order much more properly should come from those customers residing in non-taxing areas. However, we do not in any manner indicate that the order is discriminatory against them.

We elect not to rule on this issue in the posture presented. Its determination must await another day when either a city levies taxes exceeding the limitation or until objection is made by customers not in a taxing municipality. Nevertheless, in passing we note that the Utah Supreme Court has upheld surtaxing the municipal

tax to customers *without* limitation *(Ogden City v. Public Service Commission,* 123 Utah 437, 260 P.2d 751); that the Supreme Court of Appeals of Virginia has held that such an order is valid but that a limitation substantially lower than the one here involved is unreasonable, unjust and penalizing to political subdivisions *(City of Newport News v. Chesapeake & Potomac Telephone Co.,* 198 Va. 645, 96 S.E.2d 145); and that a number of courts, to say nothing of commissions, have approved such surtaxing. *Village of Maywood v. Illinois Commerce Commission,* 23 Ill.2d 447, 178 N.E.2d 345; *City of Elmhurst v. Western United Gas and Electric Co.,* 363 Ill. 144, 1 N.E.2d 489; *City of Scottsbluff v. United Telephone of the West,* 171 Neb. 229, 106 N.W.2d 12; and *State v. Department of Public Utilities,* 33 Wash.2d 896, 207 P.2d 712.

In the brief of plaintiffs in error it was stated that the additional revenue of $1,207,757 was over and above the 7.5% rate of return. This statement was not controverted in the briefs of the defendants in error. We were unable to satisfy ourselves from the record as to whether the amount was included, or was in addition to, the 7.5% rate of return. In the event that it is included, then the Commission must make an appropriate reduction of the 7.5% rate of return to exclude the figure of $1,207,757.

### VII — EFFECTIVE TIME OF ADJUSTMENTS AND REMAND

We assume that pending review the Commission has approved new rates which are now being charged by Mountain Bell in order to produce the revenue permitted by the Commission's order. We have concluded that under the circumstances of the case the adjustment of rates to reflect the changes necessitated by this opinion should be made effective as of the time such new rates went into effect. In other words, at all times under the Commission's order Mountain Bell's customers should have the benefits of the imputation of a method of accelerated depreciation and of the elimination of the allowance for abnormal inflation.

The judgment of the district court is reversed as to the issues involving the imputation of accelerated depreciation and the additional revenue approximating $1.2 million for abnormal inflation. The judgment of the district court is affirmed in all other particulars. The cause is remanded with directions that the district court order the Commission to take action consonant with the views expressed in this opinion.