COLORADO–UTE ELECTRIC ASSOCIA-
TION, INC.; Delta–Montrose Electric
Association; Empire Electric Associa-
tion, Inc.; Grand Valley Rural Power
Lines, Inc.; Gunnison County Electric
Association, Inc.; Holy Cross Electric
Association, Inc.; Intermountain Rural
Electric Association; La Plata Electric
Association, Inc.; Sangre De Cristo
Electric Association, Inc.; San Isabel
Electric Association, Inc.; San Luis
Valley Rural Electric Cooperative, Inc.;
San Miguel Power Association, Inc.;
Southeast Colorado Power Association;
White River Electric Association, Inc.;
Yampa Valley Electric Association,
Inc., Petitioners–Appellees,

v.

The PUBLIC UTILITIES COMMISSION
OF the STATE OF COLORADO; Shell
Oil Company; Atlantic Richfield Com-
pany; Exxon Company, U.S.A.; City of
Delta, Colorado, Respondents–Appel-
lants.

ATLANTIC RICHFIELD COMPANY
and Exxon Corporation,
Petitioners–Appellees,

v.

PUBLIC UTILITIES COMMISSION OF
the STATE OF COLORADO; Commis-
sioners Edythe S. Miller, Ronald L.
Lehr, as Successor to Former Commis-
sioner Daniel E. Muse; Andra Schmidt,
as Successor to Former Commissioner
Clarence Raymond Clark, III, Respon-
dents–Appellants,

and

Colorado–Ute Electric Association, Inc.,
Respondent–Appellee.

COLORADO–UTE ELECTRIC ASSOCIA-
TION, INC.; Delta–Montrose Electric
Association; Empire Electric Associa-
tion, Inc.; Grand Valley Rural Power
Lines, Inc.; Gunnison County Electric
Association, Inc.; Holy Cross Electric
Association, Inc.; Intermountain Rural
Electric Association; La Plata Electric
Association, Inc.; Sangre De Cristo
Electric Association, Inc.; San Isabel
Electric Association, Inc.; San Luis
Valley Rural Electric Cooperative, Inc.;
San Miguel Power Association, Inc.;
Southeast Colorado Power Association;
White River Electric Association, Inc.;
Yampa Valley Electric Association,
Inc., Petitioners–Appellees,

v.

The PUBLIC UTILITIES COMMISSION
OF the STATE OF COLORADO; At-
lantic Richfield Company; Exxon Cor-
poration; Shell Western E & P, Inc.,
Respondents–Appellants.

ATLANTIC RICHFIELD COMPANY
and Exxon Corporation, Appellants,

v.

PUBLIC UTILITIES COMMISSION OF
the STATE OF COLORADO; Commis-
sioners Edythe S. Miller, Ronald L.
Lehr, as Successor to Former Commis-
sioner Daniel E. Muse; Andra Schmidt,
as Successor to Former Commissioner
Clarence Raymond Clark, III; Colora-
do–Ute Electric Association, Inc.; San
Luis Valley Rural Electric Cooperative,
Inc.; Yampa Valley Electric Associa-
tion, Inc.; Intermountain Rural Elec-
tric Association; White River Electric
Association, Inc.; San Isabel Electric
Association, Inc.; Sangre De Cristo
Electric Association, Inc.; Grand Val-
ley Rural Power Lines, Inc.; Delta–
Montrose Electric Association; Holy
Cross Electric Association, Inc.; Em-
pire Electric Association, Inc.; San Mi-
guel Power Association, Inc.; Gunnison
County Electric Association, Inc.; La
Plata Electric Association, Inc.; South-
east Colorado Power Association, Ap-
pellees.

Nos. 86SA244, 86SA246.

Supreme Court of Colorado,
En Banc.

July 11, 1988.

Rehearing Denied Aug. 15, 1988.

Robert T. James, Colorado Springs, for Delta–Montrose Elec. Ass'n, Grand Valley Rural Power Lines, Inc.; Gunnison County Elec. Ass'n, Inc., Holy Cross Elec. Ass'n, Inc., Intermountain Rural Elec. Ass'n, La Plata Elec. Ass'n, Inc., Sangre De Cristo Elec. Ass'n, Inc., San Isabel Elec. Ass'n, Inc., San Luis Valley Rural Elec. Co-op., Inc., White River Electric Ass'n, Inc., Yampa Valley Elec. Ass'n, Inc.

Gorsuch, Kirgis, Campbell, Walker & Grover, William Hamilton McEwan, Joseph B. Wilson, Denver, for Empire Electric Association, Inc.

Carol A. Curran, John R. McNeill, Montrose, for Colorado–Ute Elec. Ass'n, Inc.

Holland & Hart, Robert M. Pomeroy, Jr., Timothy M. Rastello, Marcy G. Glenn, Denver, for Atlantic Richfield Co. and Exxon Corp.

Jones, Meiklejohn, Kehl & Lyons, Edward T. Lyons, Jr., Denver, for Shell Western E & P, Inc.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Eugene Cavaliere, Deputy Atty. Gen., Denver, for Public Utilities Com'n of the State of Colo.

ROVIRA, Justice.

These two cases concern a judgment of the Montrose County District Court which set aside orders promulgated by the Public Utilities Commission of Colorado (PUC or Commission) involving the design of electric power rates to be charged by Colorado–Ute Electric Association (Colo–Ute).

We reject Colo–Ute's claim that this appeal is moot. We further hold, contrary to the district court's order, that the PUC possessed statutory authority to determine whether the tariffs filed by Colo–Ute were just and reasonable. Moreover, the PUC's order that Colo–Ute's proposed all-energy rate should be replaced by a seasonally-differentiated demand-energy rate is supported by adequate findings of fact and substantial evidence. We do, however, affirm the ruling of the district court setting aside that portion of the PUC's order which allocated $24,084,126 of generation fixed costs to the energy component of the demand-energy rate design. Accordingly, we reverse in part, affirm in part, and remand for further proceedings consistent with this opinion.

I.

Colo–Ute generates and transmits electrical power on a wholesale basis to 14 member rural electrical cooperatives (co-ops), which in turn market the electrical power on a retail basis to electrical consumers. The co-ops are consumer owned and have representatives on the board of directors of Colo–Ute, a non-profit corporation.

In December 1981, Colo–Ute filed Advice Letter No. 45 with the PUC. The purpose of the filing was to increase Colo–Ute's wholesale electric power rates and thus increase annual revenue from the co-ops by approximately $11,120,603. At the time Advice Letter No. 45 was filed, Colo–Ute's pricing scheme for its member co-ops was on a "flat" or "all-energy" rate basis.[1] This pricing method had been approved by the PUC in February 1981. To reach its desired revenue increase, Colo–Ute proposed increasing its all-energy rate by a uniform 12.157 percent.

A revised rate schedule became effective on January 15, 1982. As a result of a statutory provision adopted by the legislature in 1981, which is central to a resolution of the jurisdictional issue in this case, the Commission is without authority to suspend the effective date of tariff changes filed by cooperative electric associations. *See* § 40–6–111(4)(a), 17 C.R.S. (1984). The PUC, assuming that this statutory provision relating to suspension had no effect on its authority to investigate rate filings, on January 12, 1982, initiated Case No. 6076 for the purpose of investigating the reasonableness of the tariffs filed by Colo–Ute, and set the matter for hearing.

A number of parties intervened and participated in Case No. 6076. Intervening parties included the co-ops, as well as customers of the co-ops: Union Carbide Corporation, Shell Oil Company, Exxon Company, USA (Exxon), Atlantic Richfield Company (ARCO), and the City of Delta, Colorado. At the hearings, Colo–Ute and some of the co-ops presented evidence both in support of the revenue increase and in the continued use of a flat or all-energy rate. The PUC's staff offered evidence generally supporting a revenue increase, but recommended abandoning the continued use of the all-energy rate, which the staff asserted was not "cost tracking," and therefore, no longer appropriate for Colo–Ute.[2] In its

---

1. The flat or all-energy rate does not differentiate between "demand" charges (fixed capital costs associated with the generation and transmission of electricity) and "energy" charges (variable operation and maintenance expenses, especially fuel costs). Instead, it recovers all

costs—both demand and energy—from a uniform charge per kilowatt hour (kwh).

2. "Cost tracking" simply means that the rates charged for public utility service must "track" actual costs; in other words, the utility should accurately assign actual costs to the consumers

place, the staff recommended a seasonally-differentiated demand-energy rate.[3] The intervening customers concurred in the recommendations of the Commission's staff.

The Commission approved the revenue increase sought by Colo–Ute. However, it disapproved the continued use of the all-energy rate, and ordered Colo-Ute to file "demand energy rates for its wholesale electric customers with seasonally differentiated demand charges and an annualized energy [charge] on a uniform kwh basis." Decision No. C83–1176.

Intervenors ARCO and Exxon, while in general agreement with the PUC's ultimate findings regarding the revenue increase and the substitution of the demand-energy rate, objected to that part of the PUC's decision which allocated over $24 million in generation fixed or demand costs to the energy component of the demand-energy rate design. Thereupon, ARCO, Exxon, Colo–Ute, and the co-ops filed applications for rehearing, reargument, and reconsideration. In Decision No. C83–1392, the Commission denied the application of Colo–Ute and the co-ops and granted the application of ARCO and Exxon in part. Decision No. C83–1176 was modified as a result, but such modifications are not at issue.[4]

Colo–Ute and the co-ops sought judicial review in the Montrose County District Court. The appeal was assigned Case No. 83CV218. They challenged the authority of the PUC to commence an investigation concerning the rate increase on its own motion. They also claimed that the Commission's orders with respect to rate design

were arbitrary, capricious, unconstitutional, an abuse of discretion, and not in accordance with the law and the evidence. Finally, they moved for a stay or suspension of the Commission's decisions, pending final determination by the district court of their challenge. This motion was granted.

ARCO and Exxon sought judicial review in the Denver District Court of that portion of the PUC's decisions which allegedly had misclassified certain demand costs as energy costs. Given the similarities of the parties in the Denver and Montrose District Court actions, and the presence of common questions, the Denver District Court ordered the case transferred to the Montrose District Court, pursuant to C.R.C.P. 98(f)(1), where it was assigned Case No. 84CV7. Subsequently, the court consolidated the two cases for hearing. The only issue in Case No. 84CV7 concerns the PUC's decision to shift substantial demand costs onto the energy portion of the demand-energy rate.

With respect to Colo–Ute's claims in Case No. 83CV218, the district court held, *inter alia*, that: (1) The PUC does not possess statutory authority, in the absence of a complaint, to investigate and modify the rate design of an electric cooperative association, such as Colo–Ute; (2) The PUC's orders concerning rate design amount to an unwarranted intrusion into the management prerogative and discretion of Colo–Ute; (3) The Commission's findings are conclusory in nature and are not supported by substantial evidence.[5] The dis-

---

who are causing those costs. Ideally, the rate schedule should be designed in such a way that the consumers receive accurate and clear price signals from the utility and adjust their economic behavior accordingly.

3. Under a seasonally-differentiated demand-energy rate, an electric utility charges its customers a rate which reflects separate charges for demand and energy costs. Such a demand-energy rate provides separate and distinct recognition to the two major cost components of producing electricity: capital and fuel. Seasonal differentiation refers to the imposition of different demand charges for summer and winter, reflecting the greater power load burdens placed on generating facilities during the winter months.

4. ARCO, Exxon, Colo–Ute, and the co-ops thereupon filed new applications for rehearing, reconsideration, and reargument of Decision No. C83–1392. Colo–Ute also filed a motion to stay the filing date for rates and tariffs under Decision Nos. C83–1176 and C83–1392. In Decision No. C83–1561, the PUC denied the applications and Colo–Ute's motion.

5. The district court found for the Commission on certain constitutional and administrative due process claims raised by Colo–Ute. It held that the Commission's procedures did not violate the Colorado Open Records Act; §§ 24–72–101 to –309, 10 C.R.S. (1982), or the due process clauses of the United States and Colorado Constitutions. Colo–Ute has not raised these claims on appeal.

trict court thereupon set aside that part of Decision No. C83–1176 which required Colo–Ute to file rates and tariffs ordered by the Commission.

In Case No. 84CV7, the district court concurred in the arguments presented by ARCO and Exxon, finding that the decision of the Commission to allocate over $24 million of demand costs to energy costs was not supported by substantial evidence or adequate findings of fact, was arbitrary and capricious, and resulted in an unjust and discriminatory rate. The court set aside that portion of Decision No. C83–1176 which allocated $24 million of the demand costs to the energy costs and further held that if this court (supreme court) were to find lawful the Commission's imposition of the demand-energy rate, the PUC would be directed to allocate demand-energy costs in accordance with the staff's cost-of-service study, as contained in Exhibit No. 84.[6]

On appeal the Commission raises the following issues: (1) Whether the Commission possesses statutory authority to institute on its own motion a proceeding to determine whether tariffs filed by Colo–Ute are just and reasonable; (2) Assuming that it possesses such authority, is the Commission's decision relating to rate design an unwarranted intrusion into the management prerogative of Colo–Ute, and do adequate findings of fact and substantial evidence exist to support its decision; and (3) Whether there is substantial evidence to support the findings that $24 million in generation fixed costs should be allocated to the energy component of the demand-energy rate.[7]

## II.

Before considering the substantive issues raised in the appeals, we first address the claim of Colo–Ute, raised in its answer brief, that these appeals are moot and should therefore be dismissed.

In support of its position, Colo–Ute states that in October 1986, five months after the decision of the district court, it filed a new wholesale rate tariff governing electric power sales to the co-ops which became effective by operation of law on December 1, 1986. The tariff represented a 5–percent decrease in the all-energy rate it charged the co-ops. Colo–Ute contends that since the tariff supersedes the tariff which is the subject of Case No. 6076 and these appeals, the issues raised in the instant case are "purely academic." The PUC, ARCO, Exxon, and Shell Western E & P, Inc. argue to the contrary and urge us not to dismiss on the ground of mootness.

We have previously stated that a case is not moot where interests of a public nature are asserted under conditions that may be immediately repeated. *Page v. Blunt*, 126 Colo. 324, 327, 248 P.2d 1074, 1075 (1952). Under our latest formulation of the mootness test, we have held that a case is not moot where the controversy is one "capable of repetition, yet evading review." *Goedecke v. State Dept. of Institutions*, 198 Colo. 407, 410 n. 5, 603 P.2d 123, 124 n. 5 (1979) (quoting *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)); *Star Journal Publishing Corp. v. County Court*, 197 Colo. 234, 236, 591 P.2d 1028, 1029 (1979).

This case is not moot because the issue of proper rate design survives the most recent tariff filing. Colo–Ute's 1986 rate filing retains the same flat-energy rate structure which the Commission found objectionable, and which is at issue in the instant appeal. Colo–Ute may have changed the level of its rates with its most recent filing, but the level of rates has

---

6. A cost-of-service study is a generally recognized approach for allocating a utility's various fixed and variable costs based upon a utility's actual costs of service.

7. The PUC urges reversal of the district court's order. Colo–Ute and the co-ops request dismissal on mootness grounds, or, in the alternative, to affirm the order. Intervenors ARCO, Exxon, and Shell Western E & P, Inc. (SWEPI) (the successor in interest to Shell Oil Company), urge reversal of the district court's order on the jurisdictional issue and on the question of whether substantial evidence exists to support the rate design change promulgated by the PUC. On the issue of allocation of demand charges as energy charges, ARCO and Exxon request affirmance of the district court's order.

never been a matter of dispute. In fact, the issue which has given rise to these appeals—the authority of the PUC to prescribe the demand-energy rate for Colo–Ute—presents no less a controversy now than when the PUC first set Case No. 6076 for hearing. The lawfulness of the Commission's orders with respect to Colo–Ute's rate design remains a viable legal controversy. *See New England Telephone & Telegraph Co. v. Public Utilities Comm'n,* 329 A.2d 792, 806 (Me.1974) (rejecting mootness argument based on new rate filing where important issues remain to be decided); *Milwaukee & Suburban Transport Corp. v. Public Utilities Comm'n,* 268 Wis. 573, 68 N.W.2d 552, 556, *cert. denied,* 350 U.S. 877, 76 S.Ct. 135, 100 L.Ed. 775 (1955) (controversy presented in review proceeding not moot where issue over method of computing depreciation of utility property remains a continuing controversy).

In addition, Colo–Ute's argument, if accepted, would operate to insulate much of its activity from judicial and/or Commission review. With the addition of section 40–6–111(4)(a), 17 C.R.S. (1984), the PUC no longer possesses the statutory authority to suspend the date on which a tariff filed by a cooperative electric association becomes effective. As a result, any new or revised tariff filed by a cooperative electric association such as Colo–Ute becomes effective by operation of law after the expiration of the 30–day notice period specified in section 40–3–104, 17 C.R.S. (1984). But it takes longer than 30 days for the Commission to review a rate tariff filed by Colo–Ute, to say nothing of the time necessary for an appeal of a Commission decision to work its way through the judicial system. If a cooperative could render an appeal moot merely by filing a new tariff while an appeal is pending, the Commission's authority to regulate cooperative utilities would be undermined.

Moreover, ARCO, Exxon, and Shell Western E & P, Inc. seek an order from this court directing Colo–Ute to pay refunds to customers who might have over paid under the all-energy rate scheme. Refund amounts would be based on the differ- ence in payments made under the all-energy and demand-energy rates.

If ARCO, Exxon, and SWEPI are entitled to refunds, an issue we do not decide, this would preclude dismissing the instant case on mootness grounds. It is generally the law that claims for damages or other monetary relief automatically avoid mootness, so long as the claim remains viable. Wright, Miller & Cooper, *Federal Practice & Procedure: Jurisdiction Second* § 3533.3 at 262 (1984). Other courts have rejected mootness claims in analogous circumstances, where, addressing the customer's complaint regarding damages, they first require a resolution of other issues on their merits. *See, e.g., Memphis Light, Gas & Water Div. v. Kraft,* 436 U.S. 1, 7–8, 98 S.Ct. 1554, 1559–1560, 56 L.Ed.2d 30 (1978) (although injunctive relief from utility's termination of service had been mooted, customer's claim for damages saved case challenging termination procedures from the bar of mootness); *Meyers v. Jay Street Connecting Railroad,* 288 F.2d 356, 358 (2d Cir.), *cert. denied,* 368 U.S. 828, 82 S.Ct. 49, 7 L.Ed.2d 31 (1961).

Finally, Colo–Ute cites in support of its position *Air Pollution Control Comm'n v. Colorado–Ute Electric Ass'n,* 672 P.2d 993 (Colo.1983). In that case, Colo–Ute challenged the validity of an air pollution control commission regulation setting forth conduct necessary to obtain an emission permit. Although Colo–Ute cites the case for the proposition that "when the issues in a case have been changed by subsequent events, this court has not hesitated to find that the case has been mooted," Colo–Ute has glossed over the particular facts in that case. We held in *Air Pollution Control Comm'n* that the question of whether the regulation had been validly adopted was moot, because the regulation had subsequently been repealed. 672 P.2d at 997. By comparison, Colo–Ute's all-energy rate is still in use and thus an issue which gave rise to the present controversy remains unresolved.

Having determined that Colo–Ute's mootness claim is without merit, we now ad-

dress the substantive issues raised by this appeal.

### III.

In holding that the PUC lacked jurisdiction to investigate Colo–Ute's rate filing, the district court focused upon a provision of the public utilities law which provides, in part: "Upon complaint filed by any member or customer of a cooperative electric association or by any affected public utility, the commission shall determine whether the rate, charge, rule, or regulation in question is contrary to this section, section 40–3–106(1), or section 40–3–111." § 40–6–111(4)(a), 17 C.R.S. (1984).[8] Although the court made reference to a number of other provisions in the public utilities law granting the Commission the authority to investigate rates either upon the filing of a complaint or upon its own motion, it concluded that section 40–6–111(4)(a):

> [P]ermits that authority only upon the filing of a complaint by any member or customer of a cooperative electric association or by any affected public utility. Subparagraph (4)(a) removes the power of the PUC to suspend rates, fares, tolls, rentals, charges, classifications, practices, rules or regulations pending a hearing, and does not provide that the PUC, of its own motion, may hold such hearings.

Although other statutory provisions concern public utilities in general, the court stated that section 40–6–111(4)(a) is a "specific statutory provision relating to cooperative electric associations, and must be followed." The district court relied on a maxim of statutory construction that "where specific and general statutes conflict, the provisions of the specific statute prevail." In other words, section 40–6–111(4)(a) trumps all other provisions in the public utilities law which give the PUC the authority to investigate rates upon the filing of a complaint, or upon its own motion. The court concluded that the PUC does not have the authority pursuant to section 40–6–111(4), without complaint, to change the rate design of an electric cooperative such as Colo–Ute.

 We have stated on numerous occasions that where a statute is capable of more than one interpretation, it must be construed in light of the apparent legislative intent and purpose. Among the guidelines to be considered are the ends the statute was designed to accomplish, and the consequences which would flow from an alternative construction. If separate clauses in the same statutory scheme may be harmonized by one construction, but would be antagonistic under a different construction, we should adopt that construction which results in harmony rather than that which produces inconsistency. *Mooney v. Kuiper*, 194 Colo. 477, 479, 573 P.2d 538, 539 (1978); *Travelers Indemnity Co. v. Barnes*, 191 Colo. 278, 283, 552 P.2d 300, 303 (1976). Two statutes concerning the same subject matter are to be read together to the extent possible so as to give effect to legislative intent. *Peoples Natural Gas Div. v. Public Utilities Comm'n*, 698 P.2d 255, 263 (Colo.1985). Further, we will presume that the legislature intended a just and reasonable result when it enacted a statute. *Allen v. Charnes*, 674 P.2d 378, 381 (Colo.1984). *See also* § 2–4–201(1)(b), 1B C.R.S. (1980) ("the entire statute is intended to be effective").

 The maxim of statutory construction relied upon by the district court is, however, wholly irrelevant where the spe-

---

**8.** In its entirety, section 40–6–111(4)(a), 17 C.R.S. (1984), reads as follows:

> The provisions of this section relating to suspension of rates, fares, tolls, rentals, charges, classifications, contracts, practices, rules, or regulations pending the hearing and decision thereon shall not apply to cooperative electric associations, but this subsection (4) shall not be construed to exempt such associations from any other provision of this section. Notwithstanding any other provision of law, no cooperative electric association shall establish, charge, or collect a discriminatory or preferential rate, charge, rule, or regulation which would be violative of section 40–3–106(1) or section 40–3–111. Upon complaint filed by any member or customer of a cooperative electric association or by any affected public utility, the commission shall determine whether the rate, charge, rule, or regulation in question is contrary to this section, section 40–3–106(1), or section 40–3–111.

cific statute itself—section 40–6–111—expressly vests the PUC with authority to investigate rates, and therefore, raises no conflict with other provisions of the public utilities law. If the district court had applied proper principles of statutory construction, it would not have ignored the remainder of section 40–6–111, particularly subsection (1), and other pertinent provisions of the public utilities law, all of which confirm the Commission's power and duty to investigate tariff changes involving utilities such as Colo–Ute. The district court should have read section 40–6–111(4)(a), 17 C.R.S. (1984), together with other relevant statutory provisions, including sections 40–6–111(1), 40–6–108(1)(b), and 40–3–102, 17 C.R.S. (1984), in light of the apparent legislative intent and purpose.

The General Assembly added subsection (4) to section 40–6–111 in 1981. *See* "An Act Concerning the Public Utilities Commission," ch. 482, sec. 2, § 40–6–111(4), 1981 Colo.Sess.Laws 1922–1923 [codified at § 40–6–111(4)(a), 17 C.R.S. (1981 Supp.)]. The effect of the 1981 amendment was to grant to cooperative electric associations relief from the PUC's power to suspend rates for up to 120 days pending investigation and hearing, *see* § 40–6–111(1)(b), without diminishing the PUC's power under existing statutes to investigate and hold hearings, whether upon complaint or on its own motion, and to enter remedial orders to carry out the purposes of the public utilities law.

As a result of the 1981 amendment, when a cooperative electric association files a tariff with the PUC, such a tariff becomes effective at the expiration of the 30–day notice period provided by section 40–3–104, 17 C.R.S. (1984). Therefore, any hearing commenced by the PUC, whether on its own motion, or upon complaint made to the PUC, pursuant to sections 40–6–101(1) or 40–6–111, does not have the effect of suspending the effective date of such tariffs. This is not the case, however, with respect to other utilities in Colorado subject to the PUC's jurisdiction. With respect to those utilities, the PUC still retains the power to suspend the effective date of such tariffs. *See* § 40–6–111(1)(a), (b).[9]

It was the statutory suspension power—not the PUC's power to investigate and hold hearings—which was abolished by section 40–6–111(4)(a) for the benefit of cooperative electric associations. These organizations had contended that the "regulatory lag" which accompanied the investigation and hearing process made it difficult for them, because of the intervening suspension period, to be adequately compensated for the costs of inflation even if the proposed rate increase was ultimately approved in full. *See Colorado-Ute Electric Ass'n v. Public Utilities Comm'n*, 198 Colo. 534, 544, 602 P.2d 861, 867 (1979). The efforts of cooperative electric associations to persuade the General Assembly to grant some form of relief achieved fruition with the passage of section 40–6–111(4)(a) in 1981. *See also* Advice Letter No. 45 ("Under the provisions of [section 40–6–111(4)(a)], this rate filing becomes effective on thirty (30) days notice—thereby eliminating any regulatory lag in obtaining necessary rate relief."). The statute only eases the burden on cooperative electric associations resulting from suspensions during the hearing process. It does not exempt

---

9. Section 40–6–111(1)(a), (b), 17 C.R.S. (1984), reads as follows:

**Hearing on schedules—suspension—new rates—rejection of tariffs.**

(1)(a) Whenever there is filed with the commission any tariff or schedule stating any new or changed individual or joint rate, fare, toll, ... the commission has power, either upon complaint or upon its own initiative, ... but upon reasonable notice, to have a hearing concerning the propriety of such rate, fare, toll, ... if it believes that such a hearing is required and that such rate, fare, toll, ... may be improper.

(b) Pending the hearing and decision thereon, in the case of a public utility other than a rail carrier, such rate, fare, toll, rental, charge, classification, contract, practice, rule, or regulation shall not go into effect; but the period of suspension of such rate, fare, toll, ... shall not extend beyond one hundred twenty days beyond the time when such rate, fare, toll, ... would otherwise go into effect unless the commission, in its discretion, and by separate order, extends the period of suspension for a further period not exceeding ninety days.

cooperative electric associations from PUC review of tariff changes.

The court below wrongly concluded that by removing the suspension power, the legislature also intended to limit the Commission's powers to investigate tariff changes, hold hearings, and enter remedial orders. We have previously rejected the assumption that the power to investigate and hold hearings is inseparably tied to, and dependent upon, the suspension power, such that removing the power to suspend also precludes an investigation. *See, e.g., Public Service Co. v. Public Utilities Comm'n,* 653 P.2d 1117, 1122 (Colo.1982) ("we decline to impose an 'all or nothing' requirement upon the commission"). Moreover, section 40–6–111(2)(a), 17 C.R.S. (1984), states that tariff changes "not so suspended" shall go into effect after the 30–day notice period "subject to the power of the commission, after a hearing on its own motion or upon complaint, as provided in this article, to alter or modify the same." [10] Traditionally, the PUC has enjoyed broad discretion in determining whether to suspend the effective date of newly filed rates, while under investigation, or allow rates to become effective (after the statutory notice period), fully or in part, pending the outcome of an investigation.

In enacting section 40–6–111(4)(a), the General Assembly was careful to structure the amendment in such a fashion as to make the suspension powers inapplicable to cooperative electric associations, while leaving such entities subject to the other provisions of that section and the public utilities law. The statute expressly provides that "this subsection (4) shall not be construed to exempt such associations from any other provision of this section." Among those "other provisions of this section:" section 40–6–111(1), which grants the Commission the power to have a hearing concerning the propriety of a newly filed rate or changed rate, "either upon complaint or upon its own initiative ..."; and section 40–6–111(2)(a). When the statute is read in this way—that cooperative electric associations are exempted only from that provision relating to the PUC's power of suspension—an interpretation is achieved which gives a harmonious and consistent effect to its various provisions.

In fact, when the last sentence of section 40–6–111(4)(a) is read in conjunction with section 40–6–108(1)(a) and (b) and section 40–6–111(1), it becomes possible to discern that not only are these provisions consistent with each other, but also that the last sentence of section 40–6–111(4)(a) lessens a requirement in section 40–6–108(1)(b)—thereby promoting the legislative intent behind subsection (4) of easing the regulatory burden on cooperative electric associations.

Section 40–6–108(1)(b) prohibits the PUC from entertaining complaints as to the reasonableness of any rates or charges of any public utility "except upon its own motion," or upon a complaint signed by:

> The mayor or the president or chairman of the board of trustees or a majority of the council, commission, or other legislative body of the county, city and county, city, or town, if any, within which the alleged violation occurred, or not less than twenty-five customers or prospective customers of such public utility.

On the other hand, section 40–6–111(4)(a) authorizes the PUC to determine whether a rate charged is discriminatory or preferential "[u]pon complaint filed by any member or customer of a cooperative electric association or by any affected public utility...."

---

10. Section 40–6–111(2)(a), 17 C.R.S. (1984), provides in pertinent part:

> If a hearing is held thereon, whether completed before or after the expiration of the period of suspension, the commission shall establish the rates, fares, tolls, ... proposed in whole or in part, or others in lieu thereof, which it finds just and reasonable.... All such rates, fares, tolls, ... not so suspended, on the effective date thereof, which in the case of a public utility other than a rail carrier, shall not be less than thirty days from the time of filing the same with the commission, or of such lesser time as the commission may grant, shall go into effect and be the established and effective rates, fares, tolls, ... subject to the power of the commission, after a hearing on its own motion or upon complaint, as provided in this article, to alter or modify the same.

In a sense, the complaint provision incorporated in section 40–6–111(4)(a) is a counterweight to the freedom given cooperative electric associations to increase their rates without suspension. Although the legislature, by adding section 40–6–111(4)(a), terminated the authority of the PUC to suspend the effective date of a tariff filed by an electric cooperative, the members or customers of a cooperative electric association or affected public utility were given added protection in the form of an eased requirement for challenging the utility's rate increases.

The last sentence of subsection (4) states that "[u]pon complaint ... the commission *shall* determine...." § 40–6–111(4)(a) (emphasis added). In other words, under certain circumstances the Commission is required to investigate a tariff change. But nothing in subsection (4) can be interpreted as diminishing any of the Commission's powers under existing law to investigate tariff changes and, if necessary, to prescribe just and reasonable rates.[11]

Having concluded that the PUC was properly acting within the scope of its authority, we now consider whether that authority was exercised in a lawful manner.

### IV.

The district court found "that the Commission's action in changing Colorado–Ute's rate design from a flat-energy rate to a seasonally adjusted demand-energy rate is an unwarranted intrusion into the management prerogatives and discretion of Colorado–Ute." Among the reasons given by the court were that in 1981 the PUC approved a flat-energy rate for Colo–Ute

and no findings in Decision No. C83–1176 vitiated the 1981 order, and in the absence of evidence or findings of abuse associated with Colo–Ute's existing all-energy scheme, "the Court can only conclude that the Commission is substituting its own personal preference in managerial matters and has exceeded its statutory authority."

The adequacy of the Commission's findings will be discussed later in this opinion. Considering solely the issue of managerial discretion, it is clear that the district court erred in concluding that the Commission, in prescribing the proper rate design for Colo–Ute, overstepped the bounds of its proper authority. The setting of "just and reasonable rates," both as to level and design, goes to the very essence of the Commission's duties under the public utilities law. *See* § 40–3–102, 17 C.R.S. (1984). It is precisely the Commission's *raison d' etre* to determine and prescribe just, reasonable, non-discriminatory, and non-preferential "rates of every public utility in this state." Both statutory and case law demonstrate that rate-making, both as to charge and design, is a vital part of the Commission's area of responsibility.

Rate-making is a legislative function. *Mountain States Telephone & Telegraph v. Public Utilities Comm'n*, 176 Colo. 457, 464, 491 P.2d 582, 586 (1971). Under the Colorado Constitution, art. XXV, the legislative authority in public utility matters has been delegated to the PUC. *Mountain States Telephone & Telegraph v. Public Utilities Comm'n*, 195 Colo. 130, 134, 576 P.2d 544, 547 (1978). As such, the PUC, in the area of utility regulation, including rate-making, has broadly based authority to do whatever it deems necessary

---

11. In its answer brief, Colo–Ute provides us with the legislative history of H.B. 1441, the 1981 amendment eventually codified at section 40–6–111(4)(a). This information does not support Colo–Ute's position. In fact, some of the legislative history actually supports the position of the PUC. Governor Richard D. Lamm's message accompanying H.B. 1444 is instructive on this point:

> It [H.B. 1444] will allow REA rate increases to go into effect after 30 days from the time they are filed with the PUC, thereby eliminating costly delays presently incurred because of the lengthy hearing procedure. Should a

complaint concerning the reasonableness of an increase occur, H.B. 1444 stipulates that only one complainant is necessary to *require* the PUC to review the new rate: Under existing law, 25 customers or prospective customers must complain before the PUC can intercede.... While streamlining the bureaucratic process for the rural electric cooperatives in rate setting, this legislation does not eliminate PUC control of facility development or other consumer protections.

H.R.J. 2309, 53rd Leg., 1st Sess., 1981 Colorado (emphasis added).

or convenient to accomplish the legislative functions delegated to it. *Id.; Miller Bros. v. Public Utilities Comm'n*, 185 Colo. 414, 431, 525 P.2d 443, 451 (1974).

Nowhere in title 40, C.R.S., has the legislature specifically restricted the authority of the PUC in designing rates for cooperative electric associations. To the contrary, the public utilities law imposes upon the PUC no more imperative duty than to "adopt all necessary rates ... and regulate all rates ... of every public utility of this state." § 40–3–102. No exception is provided for cooperative electric associations. Until the General Assembly changes the law, the Commission possesses not only the power and authority, but also the duty to prescribe the rates of all utilities subject to its jurisdiction. The fact that the instant case involves rate design, as opposed to rate increase, is irrelevant for purposes of the analysis. After all, rate design, just as much as rate levels, could produce unjust, unreasonable, discriminatory, or preferential results.[12]

The district court held that the Commission can set aside a rate only where "there is a substantial showing that rate payers are prejudiced materially ..." and that "the rate is so unreasonable as to be detrimental to the public interest ..."; in all other circumstances, rate design "[is] within the realm of sound management discretion of the public utility."

It is of course generally accepted that the management of the utility belongs to the company. *Public Service Co. v. Public Utilities Comm'n*, 653 P.2d 1117, 1123 (Colo.1982). The PUC may not, under the guise of rate regulation, take over the management of the company. As to matters specifically entrusted to management, the PUC may not assert itself absent an abuse of managerial discretion. *Id.* But it has never been the law in Colorado that rate-making is solely a matter within the domain of management, such that PUC involvement is triggered only following an abuse of that discretion. Rate-making, including the designing of rates, has long been the exclusive province of the Commission. In fact, in a previous case where this court recognized that "[c]ourts and Commission should ... in general, not succumb to the temptation of assuming the role of management," we went on to hold that "our regulatory commissions have a duty to declare the abuse and make such orders as will give to ratepayers the advantage of those economies in which management has failed to avail itself." *Colorado Municipal League v. Public Utilities Comm'n*, 172 Colo. 188, 203–04, 473 P.2d 960, 967 (1970).

The district court erred when it concluded that the Commission's action in ordering Colo–Ute to shift to a demand-energy rate "is an unwarranted intrusion into the management prerogatives and discretion of Colorado–Ute." [13]

---

**12.** For decisions of other jurisdictions holding that their state's PUC possesses the power and authority to regulate rate design, *see, e.g., Rhode Island Chamber of Commerce Fed'n v. Burke*, 443 A.2d 1236, 1237 (R.I.1982) (commission had authority to modify rate design submitted by electric utility); *Central Maine Power Co. v. Public Util. Comm'n*, 416 A.2d 1240, 1247 (Me.1980) (commission acted properly in regulating rate design proposal submitted by utility); *Cascade Natural Gas Corp. v. Davis*, 28 Ore.App. 621, 560 P.2d 301, 304 (1977) (authority to impose rate design different from that proposed by the utility is encompassed in statutory authority of commissioner to look after the interest of the utility's customers, to obtain a fair and reasonable rate and guard against discriminatory exactions).

**13.** The district court also held that it could discover "no findings in Decision C83–1176 which

vitiates [sic] these findings previously made by the Commission [in C81–373, in which the Commission in 1981 approved an all-energy scheme for Colo–Ute]." The adequacy of the Commission's findings are discussed, *infra*. To the extent that the court below is imposing upon PUC decision-making the applicability of *stare decisis* principles, it is in error. We have held that:

> Because of the legislative character of rate-making, the Commission is not bound by its prior decisions or by any doctrine similar to *stare decisis*. Moreover, while consistency in administrative rulings is considered essential, and while agency rulings are entitled to great weight in subsequent proceedings ... the appearance of arbitrariness is dispelled when new findings are made, as they were here, on the basis of new evidence and a new record.

*Colorado Ute Electric Ass'n v. Public Util. Comm'n*, 198 Colo. 534, 540–41, 602 P.2d 861, 865 (1979) (citation omitted). *See also B & M*

We now turn to issues concerning the adequacy of the Commission's findings, and the sufficiency of the evidence to support the findings.

## V.

### A.

*Adequacy of Commission Findings*

The district court held that the "whole tenor of Decision No. C83–1176 as it relates to rate design is one of personal preference on the part of the Commission as opposed to specific findings of fact which would support a new rate design." In the court's words:

> The commission has made no such findings in any of its decisions regarding Case No. 6076, and a review of the record indicates that no such findings can reasonably be made. The bootstrap attempt to do so in Decision No. C83–1392 makes no additional findings than those contained in the original Decision No. C83–1176. Nothing in the record supports the bold faced conclusion stated by the commission on page 3 in Decision No. C83–1392 that the flat energy rate currently charged by Colorado–Ute is discriminatory, preferential, creates an advantage, or otherwise violates 40–3–106(1) or 40–3–111.

Any ultimate findings the district court was able to discern in the PUC's decisions, whether implied or stated, were critiqued as "conclusive [sic] in nature and ... not supported by any factual findings based on the record."

■ The standard for judicial review of the Commission's decisions is governed by section 40–6–115(3), 17 C.R.S. (1984), which provides:

> (3) Upon review, the district court shall enter judgment either affirming, setting aside, or modifying the decision of the commission. So far as necessary to the decision and where presented, the district court shall decide all relevant questions of law and interpret all rele-

vant constitutional and statutory provisions. The review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the Constitution of the United States or the State of Colorado, and whether the decision of the Commission is just and reasonable and whether its conclusions are in accordance with the evidence.

We have held that this statutory provision limits the court's review of PUC decisions to a determination of whether the PUC has regularly pursued its authority, whether its conclusions are supported by findings of fact based upon adequate evidence, and whether the Commission has reached its decisions by applying the appropriate constitutional and legislative standards. *Ram Broadcasting of Colorado, Inc. v. Public Utilities Comm'n*, 702 P.2d 746, 750 (Colo.1985); *Public Utilities Comm'n v. Northwest Water Corp.*, 168 Colo. 154, 169, 451 P.2d 266, 273–74 (1969).

■ We have long held that the factual determinations of an administrative body such as the PUC are entitled to considerable deference. *G & G Trucking Co. v. Public Utilities Comm'n*, 745 P.2d 211, 216 (Colo.1987). After all, a reviewing court, since it is without the assistance of a staff, and the expertise of the Commission, should not undertake to duplicate the evaluation and judgment processes followed by the PUC in arriving at its decisions. *Morey v. Public Utilities Comm'n*, 629 P.2d 1061, 1068 (Colo.1981); *Atchinson, Topeka & Santa Fe Railway Co. v. Public Utilities Comm'n*, 194 Colo. 263, 267, 572 P.2d 138, 141 (1977). It is peculiarly within the province of the PUC to decide what weight should be accorded the evidence and to choose among conflicting inferences that may reasonably be drawn from that evidence. *G & G Trucking*, 745 P.2d at 216; *Acme Delivery Service v. Cargo Freight*

*Service, Inc. v. Public Util. Comm'n*, 163 Colo. 228, 232, 429 P.2d 293, 295 (1967) (doctrines of *stare decisis* as well as equitable estoppel are generally held not to apply to the determination of administrative tribunals).

*Systems,* 704 P.2d 839, 843 (Colo.1985). When two equally reasonable courses of action are open to the Commission, the reviewing court should not substitute its judgment for that of the Commission in selecting the appropriate alternative. *City of Montrose v. Public Utilities Comm'n,* 629 P.2d 619, 623 (Colo.1981). A reviewing court's function is limited to determining whether substantial evidence exists in the record to support the PUC's determinations. If not, the Commission's order must be set aside. If so, the judicial inquiry is at an end, for the reviewing court is not permitted to substitute its judgment for that of the Commission. *G & G Trucking,* 745 P.2d at 216.

■■■■■ Findings by the Commission need not be presented in any particular form, and a necessary finding may be implied from other findings made. *Caldwell v. Public Utilities Comm'n,* 200 Colo. 134, 138, 613 P.2d 328, 332 (1980); *Aspen Airways, Inc. v. Public Utilities Comm'n,* 169 Colo. 56, 62, 453 P.2d 789, 792 (1969). Where the Commission purports to make such findings, they must be discernible to the reviewing court. *Caldwell,* 200 Colo. at 138, 613 P.2d at 332. Further, findings of fact by the Commission must show which evidence it accepts as competent and worthy of belief, and that which it rejects. *Id.; Aspen Airways,* 169 Colo. at 62, 453 P.2d at 792. Based upon these standards we are satisfied that the Commission's conclusions are supported by adequate findings of fact.

■■■■■ Examination of Decision Nos. C83–1176 and C83–1392 reveals that the Commission's findings are adequate to support its ultimate conclusion that the all-energy rate is no longer appropriate for Colo–Ute and should be replaced in favor of the demand-energy rate. It found, based upon the evidence presented, that Colo–Ute's member distribution cooperatives exhibit a high coincidence of peak demand with the Colo–Ute system peak demand;[14] that

Colo–Ute's "total cost per unit of output has varied monthly," contrary to Colo–Ute's position that the all-energy rate and its resource management plan have resulted in a uniform cost per unit of output on a monthly basis; and that the Colo–Ute system is characterized by a "definite surplus of base load capacity at certain times which indicates that Colo–Ute has not achieved uniform loading of capacity throughout the day. This condition results in an uneconomic under-utilization of capacity."

With respect to Colo–Ute's resource management plan, the PUC found that it was not effective in that it contributed to growth in peak demands. Further, Colo–Ute's load curve is not flat; Colo–Ute has not been able to make non-member sales to fill in the valleys of its load; its load factor has deteriorated in recent years; and given likely economic prospects in the near and long-term, it is not expected that Colo–Ute will be better able "to sell energy to non-members so as to use its plants more efficiently." Also, significantly increased expenses associated with Colo–Ute's purchase of power from other utilities to meet peak demand, and the fact that Colo–Ute is "unable to meet its valleys on its system, indicate that its resource management plan and associated flat-energy rate are not working to the benefit of its ratepayers." The PUC then found that since Colo–Ute's total cost of generating a kilowatt hour is not uniform over time "it follows that a flat or uniform energy rate is not cost tracking," and the all-energy rate provides a distorted price signal to member systems.

In support of its adoption of the demand-energy rate, the PUC found that a demand-energy rate is appropriate for a utility whose members exhibit a high coincidence of peak demand with the system peak; that as much as two-thirds of Colo–Ute's costs are capital related; that the demand-energy rate, premised as it is upon the separate and distinct recognition of the two major cost components of producing electricity,

---

**14.** The term "peak demands" refers to the maximum rate of customer electricity consumption (in kilowatts) occurring during a 15 or 20-minute interval for any given month. The term

"coincidence of peak demands" expresses a relationship between a customer's and system's peak demands for a particular point in time.

capital and fuel, provides a more accurate price signal than the all-energy rate, and more directly tracks costs than an all-energy rate, as it "assigns costs more directly to the cost causer"; that the wholesale customers of Colo–Ute are capable of comprehending a demand and energy rate with a fixed customer charge; and that the demand-energy rate is the most cost tracking rate for the wholesale power charges of Colo–Ute.

One of the fundamental principles of electric power rate design is that rates charged should accurately reflect the utility's actual cost of providing service, including both capital costs and operating expenses. We have held that the "PUC must therefore set rates which protect both: (1) the right of a public utility company and its investors to earn a rate of return reasonably sufficient to maintain the utility's financial integrity; and (2) the right of consumers to pay a rate which accurately reflects the cost of service rendered." *Public Service Co. v. Public Utilities Comm'n*, 644 P.2d 933, 939 (Colo.1982).

Here, inasmuch as the Commission has made specific findings establishing that the all-energy rate currently in place is less able to track the cost of service than a demand-energy rate, the Commission has complied with the statutory requirement of determining whether the rate charged is violative of sections 40–3–106(1) or 40–3–111.[15]

The court below erred when it concluded that "these findings ... are conclusive [sic] in nature and are not supported by any factual findings based on the record." To the contrary, the Commission's findings, whether explicitly stated or implied, comply with statutory requirements that findings be made. Moreover, these findings are adequate to support the Commission's ultimate conclusions regarding Colo–Ute's rate design.

### B.
### *Substantial Evidence*

The district court held that "[t]he record does not support the conclusions reached by the PUC as to the applicability of the demand-energy rate to the Colorado–Ute system." Further, "[i]n short, there does not appear to be sufficient competent evidence for the Commission to conclude that either the demand-energy rate is most appropriate for Colorado–Ute because of the high degree of coincidence of peaks, nor [sic] that the demand-energy rate is the most cost tracking rate available for Colorado–Ute."

The standard of substantial evidence requires more than merely "some evidence in some particulars" to support the Commission's decision. *Home Builders Ass'n of*

---

15. Section 40–3–106(1)(a), 17 C.R.S. (1984), provides as follows:

**40–3–106. Advantages prohibited—graduated schedules.** (1)(a) Except when operating under paragraph (b) of this subsection (1), no public utility, as to rates, charges, service, or facilities, or in any other respect, shall make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities, or in any respect, either between localities or as between any class of service. The commission has the power to determine any question of fact arising under this section.

Section 40–3–111(1), (2), 17 C.R.S. (1984), provides in pertinent part:

**40–3–111. Rates determined after hearing.** (1) Whenever the commission, after a hearing upon its own motion or upon complaint, finds that the rates, tolls, fares, ... demanded, observed, charged, or collected by any public utility for any service, ... or that the rules, regulations, practices, or contracts affecting such rates, fares, tolls, ... are unjust, unreasonable, discriminatory, or preferential, or in any way violate any provision of law, ... the commission shall determine the just, reasonable, or sufficient rates, fares, tolls, ... to be thereafter observed and in force and shall fix the same by order. In making such determination, the commission may consider ... factors which may affect the sufficiency or insufficiency of such rates, fares, tolls, ... during the period the same may be in effect and may consider any factors which influence an adequate supply of energy and any factors which encourage energy conservation.

(2) The commission has the power, after a hearig upon its own motion or upon complaint, to investigate a single rate, fare, toll, ... or the entire schedule of rates, fares, tolls, ... of any public utility; and to establish new rates, fares, tolls, ... in lieu thereof.

*Metropolitan Denver v. Public Utilities Comm'n,* 720 P.2d 552, 562 (Colo.1986); *Ross v. Fire & Police Pension Ass'n,* 713 P.2d 1304, 1308 (Colo.1986). Review of the record satisfies us that there is substantial evidence to support the Commission's ultimate conclusions that (1) the demand-energy rate is the most cost tracking rate for wholesale power charges; and (2) "Colorado–Ute [should] file demand-energy rates for its wholesale electric customers with seasonally differentiated demand charges and an annualized energy on a uniform kilowatt basis as hereinafter ordered." Without discussing all of the evidence in detail, we will refer to the most significant presentations put before the Commission.

The Commission heard testimony from Dr. William Loehr, professor of economics and expert in the area of rate design. Loehr testified that "rates should track costs as closely as possible." Further, to properly reflect costs, "rates should be based theoretically upon marginal costs," *i.e.,* the social costs of increasing or decreasing the supply of that commodity. Since the calculation of marginal costs for utilities is difficult, however, Loehr testified that "[t]he direct application [to utilities] of marginal cost pricing is often not practical."

Rates based upon separate charges for demand and energy costs, or demand-energy rates, recognize that there are two major components to the cost of producing energy: (1) fixed capital expenses associated with the generation and transmission of electricity (demand costs); and (2) variable operating and maintenance expenses consisting primarily of fuel costs (energy costs). In Colorado, utilities, particularly Colo–Ute, predominantly use coal-fired plants. Therefore, fuel costs represent the cost of coal, which is low in comparison with oil or gas. Capital costs, however, tend to be relatively high, since it is more costly to build coal-fired facilities than oil or gas-fired ones. All utilities face tradeoffs among costs. Loehr testified that "the trick for utilities is, over the long run, to choose that combination of capital ... and fuel costs which together imply minimum total cost."

An exhibit sponsored by the president of Colo–Ute, for example, revealed that "[of] the total costs that must be recovered by [Colo–Ute], approximately two-thirds are associated with the cost of capital and one-third with the cost of fuel and purchase power." In effect, Colo–Ute has "incurred the high capital cost of coal-fired generation units to take advantage of low fuel costs."

The Commission staff's cost-of-service study, which was uncontroverted, and which was the only cost-of-service study offered, also demonstrates that Colo–Ute incurs these two types of costs, demand and energy, in supplying electricity. The cost-of-service study also indicates that approximately 56 percent of Colo–Ute's costs are fixed capital (demand) costs, and the remaining 44 percent are fuel and similar variable (energy) costs.

Loehr testified that since capital is the predominant element in Colo–Ute's costs, it should be reflected in Colo–Ute's rates. For this reason, a demand charge should be a part of Colo–Ute's rate structure. This demand charge would be designed to "track," or recover, that proportion of total cost representing capital cost. Accordingly, Colo–Ute's rates must include both demand charges, to recover fixed capital costs, and energy charges, to recover the cost of fuel and other variable expenses. Further, it was Loehr's position that these two costs should be segregated, and billed separately to each customer. If not, the utility's customers receive a distorted price signal, and do not pay a rate that tracks the actual cost of providing electric service.

The rationale behind the demand charge, as explained by Loehr, is that through such a charge, Colo–Ute's customers, *i.e.,* member systems, can be charged directly for their share of the use of the Colo–Ute system's facilities. "[A]s the system grows, members must choose whether or not to place increasing demands upon that system. Increased demands on the system imply additional commitments of capital resources. [Colo–Ute] members should face a rate structure which reflects the cost of

the capital resources that they will force [the Colo–Ute system] to incur should they choose to increase demand."

Other witnesses, including Warren L. Wendling, a public utilities engineering analyst, offered testimony in which they recommended that Colo–Ute adopt a seasonally-differentiated demand-energy rate. Among the advantages cited were: (1) Demand-energy rates provide an incentive to customers to adjust their consumption pattern so that the total costs to them are lowest and marginal costs of the system are lowest; (2) the system would be deferring capital investments in generation and transmission plants; and (3) other benefits lie in reduced capacity purchases on peak or for reserve requirements, and in reduced operation and maintenance costs.

Moreover, the witnesses testified that any demand charges should be seasonally differentiated, since the Colo–Ute system peaks in the winter time, not in the summer time. The staff's analysis based on an adjusted total cost-of-service shows a significant disparity between the system's summer and winter season costs (the summer figure is 34.545 mills per kwh; the winter figure is 42.625 mills per kwh). Growth in peak demand in winter is the type of growth which causes the system to incur additional capital expenditures. "A higher demand charge in winter than in summer should be used to signal [Colo–Ute] members that their winter peak consumption places constraints upon the capacity of the system." [16]

When asked their opinions of the all-energy rate as proposed by Colo–Ute, the rate design specialists attacked such a scheme as failing to track costs, and therefore, failing to properly reflect the costs of service. In Loehr's words:

I do not believe the flat energy rate to be based upon sound principles and therefore I cannot recommend it. The flat energy rate is constructed as if the only cost of generating and supplying electricity were fuel costs. Since fuel costs are

only a small part of total costs, a flat energy rate conveys a distorted price signal. As I mentioned before, the main costs are the costs of capital. A flat energy charge conveys a signal to the members and their ultimate customers to conserve energy. It conveys no signal related to how they conserve energy. If energy conservation occurs during off peak periods, but energy use remains high during peak periods, the system will still have to incur the costs of capacity to provide power on peak, yet use that capacity less during off peak periods. The result of this would be that capacity costs would have to be spread over fewer kwh and the average price per kwh would have to rise.

Wendling, when asked whether Colo–Ute's flat-energy rate is a "just and reasonable rate," responded that the flat-energy rate "does not reflect how a utility is planned, constructed nor operated. The rate does not track costs to cost causers. Therefore the rate is not just."

The record indicates additional evidence regarding the Colo–Ute system's load factor and coincidence of member peak demands with system peak demands, both of which underscore the failings of Colo–Ute's all-energy rate structure, and the beneficial results which would accompany the introduction of the demand-energy rate structure.

Colo–Ute witness Krumins contended that "the combination of a flat energy rate and Colorado–Ute's resource management plan have resulted in a uniform cost per output on a monthly basis, the operation of generation units at full capacity and a flat load curve." In fact, an exhibit sponsored by Krumins, "makes it clear that during the test year total costs varied from 3¢/kwh in January to 4.3¢/kwh in October, a 1.3¢/kwh difference (or 43 percent); by 1982, the total cost varied from 3¢/kwh in January to 4.5¢/kwh in June, a difference of 1.5¢/kwh (or 50 percent)." On the basis of these figures, the Commission concluded

**16.** Additional fuel is required as additional electric energy is consumed. A component of the electric power rates reflecting additional fuel costs is, therefore, also in keeping with the principle that rates should track costs.

"from Colo–Ute's own evidence that the total cost per unit of output has varied monthly." Further, since Colo–Ute's total costs of generating a kwh are not uniform over time, "it follows that a flat [or all] energy rate is not cost tracking."

Finally, the Commission heard testimony regarding the coincidence of peak demands within the Colo–Ute system. After noting that "[t]he commission relied heavily upon Exhibit 94 in an attempt to show a high coincidence between the system's peaks and the members' peaks," the court below remarked that "that exhibit does not appear to accurately track all of the data available to determine coincidence of peaks." Further, the exhibit "shows that the peaks are not nearly as coincident as believed by the commission." The Commission's findings on this issue, however, are also supported by substantial evidence.

Among other pieces of information, Exhibit 94 documents the dates, times, and monthly peak demands for Colo–Ute and its co-op members during the period from November 1980 through October 1981. Working with this data, Mitchell, a staff witness, testified that during February 1981, which is the highest peak load month of Colo–Ute's system during the test year, 8 of the 10 members documented peaked during the top 5 percent of peak hours of the entire Colo–Ute system. The exhibit further demonstrates that in February 1981, the 14–member coincidence peak as a percentage of the maximum demand for the system as a whole was 96.18 percent, and, in fact, for the entire test year, in only two months did this figure drop below 90 percent. Moreover, for all months of the test year the Colo–Ute members had individual peaks which were highly coincident with the Colo–Ute system peak. Further, another exhibit submitted by Colo–Ute, and which indicates that 9 of the 14 members exhibited a coincidence in excess of 90 percent, similarly demonstrates the high coincidence of member demands with the system peak.

The significance of all this for rate design is that the Commission heard testimony that "[i]n cases where peak demands

tend to be highly coincident, a demand-energy rate is appropriate."

This evidence regarding peak demands is more than sufficient to support the Commission's findings on this issue. In ignoring or casting aside Exhibit 94, the court below exceeded the proper standard of judicial review.

The evidence put forth by Colo–Ute and the Commission staff to support or challenge the propriety of the all-energy rate design was in dispute. Given the conflicting nature of the evidence, alternate conclusions could have been reached. All this establishes is that the Commission performed its duty by resolving these disputed issues of fact in favor of the demand-energy rate. The court may have disagreed with these findings on disputed questions of fact, but it is not within the province of the district court to substitute its judgment for that of the PUC on disputed questions of fact. *Answerphone, Inc. v. Public Utilities Comm'n*, 185 Colo. 175, 178, 522 P.2d 1229, 1230 (1974).

Substantial evidence supports the Commission's adoption of the seasonally-differentiated demand-energy rate. The district court's rejection of the Commission's findings constitutes an impermissible intrusion into the PUC's rate-making process. Accordingly, the order of the district court in Case No. 83CV218 is reversed.

## VI.

█ Finally, we consider the issue raised in Case No. 84CV7. In that case, two customers of the co-ops, ARCO and Exxon (ARCO/Exxon), sought review of that portion of the Commission's decision which allocated over $24 million of generation fixed costs (demand costs) to the energy component of the demand-energy rate.

The evidentiary basis for the allocation was provided by Wendling who testified that electric utilities, in an effort to operate in the most economical manner, construct a mixture of base-load, intermediate, and peaking power plants. Base-load plants (usually either coal or nuclear) are designed to run 24 hours a day and are characterized by high capital costs and low

operating costs, whereas peaking plants (usually oil-fired or gas-fired) are designed to be operated for short periods of time, and are characterized by low capital costs, but high operating costs.

Wendling was of the opinion that with respect to generating costs only, there should be a recognition of a utility's greater investment in a generating plant able to burn coal:

> A utility can minimize its investment in a generation plant by constructing oil or gas fired generators. However, a fuel cost penalty is increased. On the other hand a utility may expend more capital and build a coal fired unit and burn a lower price fuel. Therefore, this additional investment should be recovered in the energy charge.

He testified that one method used by utilities to address capacity problems resulting from a utility's greater investment in higher capital cost generation is the adoption of a time-of-day rate, which recognizes the use of capacity at the time it occurs.[17] He noted that a number of obstacles stood in the way of Colo–Ute's adoption of a time-of-day rate, including the increased complexity of metering and billing, and the need to perform cost allocation studies for the distribution cooperatives. Wendling conceded that the PUC staff had failed to request the data necessary to formulate or propose such a rate for Colorado–Ute.

As a surrogate for this time-of-day rate which he believed appropriate for the Colo–Ute system, and to compensate for the recognized insufficiencies regarding time-of-day rate data, Wendling proposed a modification of the basic demand-energy rate. This surrogate would be created by shifting to the energy component of the demand-energy rate $24,084,126 of demand costs representing the "average" portion of

the "average and excess demand (AED)" allocation.[18]

Wendling testified that since the average demand component of the AED allocation is analogous to the base-load portion of generating capacity—the costs of which are recovered through the energy charge under time-of-day rates—the average demand component should, therefore, be recovered in the energy charge. As the Commission described this modification: "Mr. Wendling testified that for the Colorado–Ute system, the amount so calculated approximated very closely the dollars of base-load generation that would have been spread to all hours by a time of use rate." For Colo–Ute this average demand component, *i.e.*, the $24 million in demand-related costs, is a surrogate for the cost of base-load generation.

In effect, the allocation of $24 million in generated fixed (capital) costs to be recovered under the variable (operating) costs is a recognition of the fact that Colo–Ute, because it had constructed only coal-fired base-load plants, was using such plants to meet its peak, and therefore, was substituting capital costs for operating costs in its operations. As a result of this allocation, member cooperatives would be charged the same rates as if Colo–Ute had originally constructed the "correct" mixture of plants.

Relying exclusively on the time-of-day surrogate approach, the Commission concluded that the revenue requirement associated with base-load generation should be transferred to the energy charge, and only the excess portion of the AED allocation should be collected in the demand charge. The Commission determined that placing only the excess portion of the AED allocation in the demand charge would provide an automatic incentive for Colo–Ute to improve its system load factor, since: "The

17. A time-of-day rate varies the price of demand and/or energy over the hours of the day. Such a rate attempts to signal to customers the various costs associated with generating electricity throughout various periods of the day.

18. The "average and excess demand (AED)" allocation is a method used for allocating demand-

related costs. It allocates a portion of the demand-related costs on the basis of "average" demand (kilowatt hour usage throughout the year) and the remainder of the demand-related costs on the basis of "excess" demand (the difference between the utility's peak and average demands).

higher the load factor becomes, the higher is the proportion of generation costs collected in the energy charge and the lower is the demand charge. This provides the incentive to maintain and improve the system load factor that was absent in the flat energy rate."

Because the court found that "there was no technical literature to support this classification and that the witness had conducted no research or studies which would support this misclassification," it concluded that the Commission's decision was not supported by substantial evidence and was arbitrary and capricious.

Next, the district court concluded that the Commission failed to make adequate findings of fact to support its classification of certain demand costs as energy costs. "[T]here was no finding nor evidence which suggested how the shift of the [$24 million] corresponded to the premise," *i.e.*, Colo–Ute's needing a greater investment of capital than that generally needed for oil or gas plants.

Finally, the court held that the PUC rate is discriminatory and establishes a preference because it requires a high-load customer to subsidize a low-load customer, and summer users to subsidize winter users. It reasoned that the shift of demand cost to energy cost, which is contrary to the Commission's own cost-of-service study, results in an unjust and discriminatory rate in violation of section 40–3–106.

The district court set aside that portion of the Commission's order which allocated over $24 million in demand cost to energy cost. Further, the court ruled that if the supreme court were to set aside the district court's order in No. 83CV218, and, in effect, uphold the Commission's adoption of the demand-energy rate design, then the Commission would be directed to adopt rates based upon the staff's cost-of-service study as set forth in the record.

## A.

As noted above, section 40–6–115(2) and (3) limits the district court to a narrow scope of review. Part of this review includes determining whether the Commis-

sion's findings of fact are based upon substantial evidence. *Ram Broadcasting of Colorado*, 702 P.2d at 750. Our review of the record indicates that the Commission's decision to shift $24 million in demand cost to the energy component of the demand-energy rate is not supported by substantial evidence.

After the Commission concluded, based upon the cost-of-service study, that the seasonally-differentiated demand-energy rate is necessary and appropriate for Colo–Ute, it disregarded the rates dictated by that same cost-of-service study and classified certain demand costs as energy costs in the rates finally adopted. Although the cost-of-service study revealed that 56 percent of Colo–Ute's costs were demand related and 44 percent energy related, the Commission then adopted Wendling's recommendation to transfer a substantial amount of Colo–Ute's demand costs to the energy component of the rate, thereby assigning ultimately 32 percent of the utility's costs to the demand component, and 68 percent to the energy component. This change represents a shift from demand to energy of approximately 24 percent of the utility's actual costs.

During the hearing, Wendling testified that a time-of-day rate could not be properly calculated without further data, and that he had not asked Colo–Ute for off-peak demand billing data so that he could actually prepare a time of use seasonally-differentiated rate. He also stated that the surrogate-time-of-day rate adopted by him was without support in the Commission staff's own studies, in outside research, or in the technical literature. The following exchange which occurred during his cross-examination is instructive:

QUESTION: And again, what is your authority, if there is any authority for such an assumption?

ANSWER: I don't believe I have an authority.

QUESTION: Okay. Have you done any—

ANSWER: Other than myself.

QUESTION: —research on the development of the AED allocation factor that supports this?

ANSWER: No.

QUESTION: Can you give me any reference in technical literature that you are familiar with which indicates that, where the AED method is characterized as being a proxy for base-load and peaking generation?

ANSWER: Well, my previously referred to work papers on the time-of-day design did that.

QUESTION: But as far as technical literature which might support that approach, can you refer me to anything which parallels your recommendation?

ANSWER: I can't.

When Wendling was asked whether the approach he was recommending has ever been advocated by the Commission in other rate cases, he responded: "Well, it might have been but I am not familiar with them or what their intent was, \or for what purposes they were advocated." [19]

Viewing the record as a whole, and in a light most favorable to the Commission, *G & G Trucking*, 745 P.2d at 216; *Home Builders Ass'n*, 720 P.2d at 560, we conclude that Wendling's unsupported opinion does not constitute substantial evidence necessary to uphold the decision of the Commission.[20] *Home Builders Ass'n*, 720 P.2d at 562–63.

### B.

■ We have held that where an order of the Commission is issued solely as a matter of administrative convenience, or in the absence of sufficient investigation into pertinent considerations, the order is arbitrary, capricious, and invalid. *City of*

*Montrose v. Public Utilities Comm'n*, 197 Colo. 119, 123, 590 P.2d 502, 505–06 (1979) (commission's order arbitrary and capricious, where no study commissioned regarding cost-of-service breakdown, although study was feasible, and no discussion in commission's order of disparate service cost; therefore, order issued solely as a matter of administrative convenience). Further, orders of the Commission which are arbitrary and capricious must be set aside. *Peoples Natural Gas Div. v. Public Utilities Comm'n*, 698 P.2d 255, 265 (Colo. 1985); *Colorado Municipal League v. Public Utilities Comm'n*, 687 P.2d 416, 419 (Colo.1984). *See also Federal Trade Comm'n v. Crowther*, 430 F.2d 510, 514 (D.C.Cir.1970) (adoption of significant policy change without sufficient study and explanation is arbitrary and capricious).

■ The same factors which cause us to conclude that the Commission's conclusions are not supported by substantial evidence, also lead us to find this portion of the Commission's decision arbitrary and capricious. The proposed shift to demand costs represents little more than an ad hoc and unsupported analytical shortcut invented and adopted simply because the necessary rate design studies had not been performed by the Commission staff. The evidence clearly shows that such a study was entirely feasible, had the staff collected the necessary data. The district court, therefore, was fully justified in holding that this portion of the Commission's order was arbitrary and capricious.

### C.

■ As noted above, section 40–6–109(3) imposes on the Commission the re-

19. Moreover, Gary Pearson, Colo–Ute's supervisor of rate and cost analysis, testified that he could not think of "any articles concerning utilization of this type of rate in any other wholesale rate proceeding"; further, to his knowledge, "this rate concept [has never] been used in Colorado before."

20. *See also Electricity Consumers Resource Council v. Federal Energy Regulatory Comm'n*, 747 F.2d 1511 (D.C.Cir.1984). In that case, the court reversed the adoption by the Federal En-

ergy Regulatory Commission (FERC) of a ratemaking modification which effectively shifted demand costs to the energy component of the electric rate in question. The court held that the evidence failed to show that the modification would result in a rate which was cost tracking. In the words of that court: "[T]he commission appears to treat the demand charge like modeling clay in order to force the application of marginal cost pricing to the energy component." 747 F.2d at 1515.

quirement that a reported decision shall be accompanied by findings of fact. Moreover, section 40–6–111(4)(a) obliges the Commission to determine whether the rate or charge issue violates sections 40–3–106(1) and –111. The factors relied upon by the Commission must be sufficiently clear to enable the court to engage in meaningful review of the Commission's decision. *Caldwell v. Public Utilities Comm'n,* 200 Colo. 134, 138, 613 P.2d 328, 332 (1980).

■ The Commission justified its decision to shift demand costs on the grounds that Colo–Ute makes use of coal-fired power plants which require a greater investment of capital than is needed for oil or gas facilities. The Commission failed to find, however, that the specific amount of demand costs shifted to the energy charge accurately corresponds to the incremental additional capital costs of coal plants in comparison with oil or gas facilities. Indeed, the Commission could not have made such a finding since no evidence was presented on this point.

We hold that the Commission failed to conform to the statutory requirements that its reported decisions be accompanied by adequate findings of fact.

### D.

■ Finally, section 40–3–102 imposes upon the Commission a duty to prevent unjust discrimination in rates. Further, section 40–3–106(1) recognizes that such discrimination may manifest itself in a number of ways. We have previously held that one of the primary purposes of the Commission's regulatory scheme is "to insure that the rates charged are not excessive or unjustly discriminatory." *Cottrell v. City & County of Denver,* 636 P.2d 703, 711 (Colo.1981).

ARCO and Exxon have alleged that the rate design ultimately approved by the PUC, with its accompanying shift in demand costs, unlawfully discriminates in two ways: (1) It establishes a preference for winter users and, in effect, requires summer users to subsidize winter customers; and (2) creates a preference in rates for low-load factor customers at the expense of high-load factor customers, who would then pay excessive rates to subsidize preferred customers.

We need not resolve these claims, however, as the Commission's errors mandate that this portion of Decision No. C83–1176 be set aside.

In summary, we reject Colo–Ute's claim that this appeal is moot. We hold that the PUC possessed statutory authority to institute, on its own motion, Case No. 6076, to determine whether the tariffs filed by Colo–Ute were just and reasonable. The Commission's order that Colo–Ute adopt a seasonally-differentiated demand-energy rate is supported by adequate findings of fact and substantial evidence. We affirm the ruling of the district court setting aside that portion of the PUC's order which classified over $24 million of demand costs as energy costs.

Accordingly, we reverse in part, affirm in part, and remand for further proceedings consistent with this opinion.

ERICKSON, J., concurs in part and dissents in part.

LOHR and VOLLACK, JJ., join in the concurrence and dissent.

ERICKSON, Justice, concurring in part and dissenting in part:

I would affirm the decision of the Public Utilities Commission of Colorado (PUC). I agree with the majority that this appeal is not moot and that the PUC had statutory authority to determine *sua sponte* whether the tariffs filed by Colorado–Ute Electric Association (Colo–Ute) were just and reasonable. I also agree with the majority that substantial evidence supports the PUC's order that Colo–Ute's proposed rate be replaced by a seasonally differentiated demand-energy rate. In my view, however, competent evidence supports the PUC's allocation of $24,084,126, representing part of the fixed capital costs of Colo–Ute's coal-fired plants, to the energy component of the formula used to determine the new rate. Accordingly, I would re-

verse the trial court and remand with directions to affirm the PUC's order.

## I.

The PUC's order is supported by the testimony of Warren L. Wendling (Wendling),[1] a Public Utilities Engineering Analyst employed by the PUC. Generally, utilities employ three types of power plants to meet fluctuating demands for electricity. Coal-fired plants typically operate continuously. They are expensive to construct, but because of the low cost of coal, cheap to operate. The combined generating capacity of plants that a utility operates continuously is called the "base load capacity" of the utility.[2] When the demand for electricity exceeds the base load capacity, the utility typically uses either oil- or gas-fired plants to satisfy the "peaks" in demand.[3] These plants are cheap to build, but because of the high cost of oil and gas, expensive to operate. Contrary to industry practice, Colo–Ute employs only coal-fired plants to meet all of its commitments to power users.

As an integral part of the PUC's rate determination, Wendling performed a cost-of-service study (study) to compute the utility's "cost of service," the total revenues required to cover the utility's cost of operation plus a fair return on its investment.

The "cost of service" is used to set the demand-energy rates for each of Colo–Ute's customers.[4] The study allocates costs to each customer by dividing Colo–Ute's costs into numerous categories. The costs distributed to each category are adjusted to provide Colo–Ute with a reasonable rate of return and then allocated to each customer based in part on the customer's consumption of electricity. Wendling's study was the only cost-of-service study of Colo–Ute presented to the PUC.

In the cost-of-service study, Wendling followed generally accepted cost allocation methods, such as that contained in the NARUC Electric Utility Cost Allocation Manual. Generally accepted allocation methods assume that a utility uses either oil- or gas-powered plants to meet peaks in demand. Accordingly, Wendling concluded that the study results had to be modified to reflect Colo–Ute's investment in coal-powered plants to meet peaks in demand. Colo–Ute's use of coal-fired plants, rather than oil- or gas-powered plants, to meet surges in demand in excess of base load capacity results in lower fuel costs but higher plant construction costs (capital costs). To strictly follow the unmodified study results would defeat the purpose of the study itself; that is, the study's results would not accurately track Colo–Ute's actu-

1. The qualifications and experience of Wendling were admitted as evidence. Wendling has a bachelors degree in electrical engineering, a masters degree in science, and a masters degree in business administration. He is a registered professional engineer in Colorado with over eight years' experience in electrical engineering. He has previously testified as an expert witness before the PUC in other cases involving rate determinations.

2. "Base load" units are those units that are in continuous operation and "base load capacity" is the generating capacity of those units. *Mississippi Indus. v. Federal Energy Regulatory Comm'n*, 808 F.2d 1525 (D.C.Cir.), *vacated in part*, 814 F.2d 773 (D.C.Cir.), *opinion reinstated*, 822 F.2d 1103 (D.C.Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 500, 98 L.Ed.2d 499 (1987). The "generating capacity" of a power plant refers to the maximum amount of electricity that it can generate.

3. Peak demand refers to demand in excess of base load capacity. The plants used to meet peaks in demand are called "peaking plants."

The typical period of peak demand for utilities is during the winter, when energy demand far exceeds demand during other times of the year. During non-peak periods, demand is typically met by the base units, which are generally coal powered plants. When the demand of cooperative members is less than base load capacity, Colo–Ute sells the unused capacity to non-members.

4. The demand variable is a component used to determine the demand-energy rate and is the sum of several components, including a generation component. The generation component is based on total average and excess demand (also called "Average and Excess Demand"), which is the sum of the average demand and excess demand figures. Demand-related costs are allocated by the generation component based on "average demand" (annual kilowatt hour usage) and "excess demand" (difference between the utility's peak and average demands).

al cost of service.[5] Without appropriate adjustments, the demand-energy rates would cause non-peak users of electricity to subsidize peak users. Accordingly, based upon his analysis of Colo–Ute's operations Wendling modified the results of his study by allocating $24,086,126, the plant capital costs required to supply peak demand, from the demand component of the demand-energy rate to the energy component. The modification caused customers to pay more for electricity used to satisfy peak demands than under the unadjusted rates.[6]

Based on the testimony of Wendling, the PUC made the following findings:

> Wendling testified that ... there should be a recognition of the utilities' [*sic*] investment in thermal coal-fired generation plants. Investment in such plants minimizes the cost of fuel relative to investment in peaking plants with its attendant low capacity or capital costs and high fuel costs for fuels such as oil or gas.
>
> ... Substantial portions of [Colo–Ute's coal-fired units] are being used for peaking purposes. In effect, units with high capital costs and low running costs have

been substituted for units with low capital costs and high running costs in meeting Colorado Ute's [electrical needs]. Although such capital substitutions may accord with the national energy policy, *it nevertheless creates an artificially high demand charge and an artificially low energy charge. Moreover, no recognition is given to the off-peak use of base load capacity.*

The PUC examined Wendling's modification of the study results and concluded that the allocation would enable more accurate tracking of Colo–Ute's costs.[7]

## II.

Atlantic Richfield Company (ARCO) and Exxon Corporation (Exxon), two customers of Colo–Ute who will pay higher power costs as a result of Wendling's modification, contend that the PUC's decision to modify the study results is not supported by substantial evidence. They argue that the capital costs of the coal-powered plants are "fixed costs" and can only be recovered in the demand variable of the demand-energy rate and that the allocation of $24,084,126 to the energy component of the rate was arbitrary and capricious. Finally, they

5. Wendling testified:

The energy charge was computed [after the demand charge]. Here Staff is proposing only for generation costs to recognize the increase[d] investment in demand related dollars made by Colorado–Ute in its generating plant so that they can burn coal. A utility can minimize its investment in generation plant by constructing oil or gas fired generators. However, a fuel cost penalty is [incurred]. On the other hand a utility may expend more capital and build a coal fired unit and burn a lower priced fuel. Therefore, this additional investment should be recovered in the energy charge. To accomplish this consistent with the cost of service methodology the average portion of the average and excess demand allocation factor was split....

6. Wendling testified that another way to accurately track Colo–Ute's costs is through a time-of-day rate. He stated that a portion of the average demand component of the average and excess demand allocation for Colo–Ute should be recovered in the energy charge since that component is analogous to the base load portion of generating capacity. In time-of-day rates, the costs of base load generating capacity are recovered through the rate's energy compo-

nent. He stated that a similar formula was used in two prior PUC rate determinations. According to Wendling, his rate design tracked costs better than time-of-day rates and was much easier to implement. The PUC and Wendling use the terms "time-of-day rate" and "time-of-use" rate interchangeably.

7. Other pertinent parts of the PUC order stated:

One way to address [Colo–Ute's investment in coal fired plants to meet peaks in demand] is by the use of a time-of-use rate which would recognize the use of capacity at the time it occurs.

The disadvantages of a time-of-use rate, of course, is the increased complexity of metering and billing and the need to perform cost allocation studies for the distribution cooperatives. As a surrogate for such a rate, Mr. Wendling proposed a modification of the demand-energy rate. In this modified rate, the dollars of generation costs associated with the average portion of the [average and excess demand] allocation were spread into the energy charge. Mr. Wendling testified that for the Colorado–Ute system, the amount so calculated approximated very closely the dollars of base load generation that would have been spread to all hours by a time-of-use rate.

claim that the PUC's prescribed energy rates are discriminatory in violation of sections 40–3–102 and –106, 17 C.R.S. (1984 & 1987 Supp.).

### A.

In reviewing the propriety of the PUC's modification to the demand-energy rate, we must consider two issues: (1) whether the decision to modify the rate formula constituted an abuse of discretion and (2) whether the amount of the modification was supported by the record. Concerning the first issue, the PUC has broad discretion in determining rates, provided the rates are just and reasonable. *Colorado Ute Elec. Ass'n, Inc. v. Public Util. Comm'n,* 198 Colo. 534, 602 P.2d 861 (1979); *Consumers' League v. Colorado & S. Ry.,* 53 Colo. 54, 125 P. 577 (1912); § 40–3–102. It is the result reached, not the method employed, which determines whether a rate is just and reasonable. *City of Montrose v. Public Util. Comm'n,* 629 P.2d 619 (Colo.1981). Orders of the PUC are presumed to be just and reasonable. *Id.* at 623. Rate-making is not an exact science but a legislative function involving many questions of judgment and discretion based upon a myriad of factors including evidentiary facts, calculations, known factors, and adjustments that may affect the relationship between known factors. *City of Montrose,* 629 P.2d at 623; *Colorado Ute Elec. Ass'n,* 198 Colo. at 539, 602 P.2d at 864. A reviewing court has neither the expertise nor resources of the PUC and, absent a clear abuse of discretion, should not substitute its judgment for that of the PUC. *Atchison, T. & S. F.*

*Ry. v. Public Util. Comm'n,* 194 Colo. 263, 572 P.2d 138 (1977).

In my view, the decision to modify the demand-energy rate formula was not an abuse of discretion. The PUC found, based on competent evidence, that the cost-of-service study did not accurately track Colo–Ute's costs because the study's cost allocations assumed that oil- and gas-powered plants would be used to meet peaks in power demand. The assumption of the study was inappropriate in this case since Colo–Ute employed only coal-fired plants to meet peaks in energy demand. The unmodified rates also failed to realize a policy goal of the PUC. The rates, by not charging increased costs for electricity used to supply peaks in demand, would not encourage Colo–Ute's customers to conserve energy and encourage Colo–Ute to improve its load factor.[8] Although the ability of the PUC to effect social policy through rate-making is limited, *Mountain States Legal Foundation v. Public Utilities Commission,* 197 Colo. 56, 590 P.2d 495 (1979), the PUC has a duty to protect the public from unreasonable and unjust rates and to prevent destructive rate-making that could adversely affect the availability of service to the public. *Consolidated Freightways Corp. v. Public Util. Comm'n,* 158 Colo. 239, 406 P.2d 83 (1965); *see Consolidated Gas Supply Corp. v. Federal Power Comm'n,* 520 F.2d 1176 (D.C.Cir.1975) (holding federal power commission's adoption of new rate formula, shifting a greater proportion of capital costs from the demand component to the commodity component of the rate formula, to be just and

**8.** A customer's annual "load factor" is the percentage relationship of its average daily demand (annual use/365) to its maximum daily demand. *Northern Ind. Pub. Serv. Co. v. Federal Energy Regulatory Comm'n,* 782 F.2d 730 (7th Cir.1986). Concerning the modification of the demand-energy rate, the PUC order stated:

... For Colorado–Ute's particular load shape and seasonality, the excess portion of the AED [average and excess demand] is a proxy for the peaking portion of the generating facilities. This peaking capacity was allocated on the basis of coincident peak demand recognizing that the members exhibit a high coincidence with the Colorado–Ute system peak. Placing only the excess portion of the

AED allocation in the demand charge provides an automatic incentive to Colorado–Ute to improve its system load factor since the higher the load factor becomes, the higher is the proportion of generation costs collected in the energy charge and the lower is the demand charge. This provides the incentive to maintain and improve the system load factor that was absent in the flat energy rate.... This should, if applied in conjunction with an effective resource management plan, produce essentially a flat rate, the very rate Colorado Ute seeks to employ. This rate form has the additional advantage that, in the present application, it comports with the regulatory objective of rate stability.

reasonable where the modification was supported neither by technical research nor by commission studies); *Fuels Research Council, Inc. v. Federal Power Comm'n,* 374 F.2d 842 (7th Cir.1967) (recognizing federal power commission's broad discretion in using rate formulas to achieve policy goals); *State Corp. Comm'n v. Federal Power Comm'n,* 206 F.2d 690 (8th Cir. 1953) (affirming power commission's adoption of new rate formula that was supported neither by technical literature nor by commission studies or research), *cert. denied,* 346 U.S. 922, 74 S.Ct. 307, 98 L.Ed. 416 (1954). Considering the innumerable factors that must be identified and quantified to determine rates, scientific precision in rate-making is not always possible and the PUC must be accorded broad discretion in setting rates. Accordingly, since the impact of the modified rate on Colo–Ute and its customers is just and reasonable, the modification of the rate was not an abuse of discretion.

### B.

The second issue raised by ARCO and Exxon is whether the amount of the modification, $24,084,126, is supported by the record. Section 40–6–115(3), 17 C.R.S. (1984), limits the scope of judicial review to determinations whether a PUC decision is unconstitutional, "whether the decision ... is just and reasonable," and "whether its conclusions are in accordance with the evidence." It is well established that the findings and conclusions of the PUC on disputed questions of fact, when based on competent evidence, are final and must be upheld on judicial review.[9] *See, e.g., Mellow Yellow Taxi Co. v. Public Util. Comm'n,* 644 P.2d 18 (Colo.1982); *Contact–Colorado Springs, Inc. v. Mobile Radio Tel. Serv., Inc.,* 191 Colo. 180, 551 P.2d 203 (1976). While the factual findings of the PUC need not be presented in any particular form and may even be implied, the findings must be discernible to the reviewing court. *Caldwell v. Public Util. Comm'n,* 200 Colo. 134, 613 P.2d 328 (1980).

In my view, the amount of the modification is supported by competent evidence and must be upheld on review. Based upon his analysis of Colo–Ute's operation and his calculations, Wendling stated that a modification of the rate formula in the amount of $24,084,126 was necessary to permit accurate tracking of Colo–Ute's costs.[10] Although a time-of-day rate would also have enabled accurate tracking of Colo–Ute's costs, Wendling testified that that rate would be much more difficult to implement and would provide less accurate results. Accordingly, the modification of the demand-energy rate must be upheld on review.

### III.

Finally, ARCO and Exxon contend that the PUC's prescribed energy rates are discriminatory in violation of sections 40–3–102 and –106, 17 C.R.S. (1984 & 1987 Supp.). They claim that the PUC's modifications to the demand-energy rate do not

---

9. We have also held that the PUC's findings and conclusions may be set aside or modified if not supported by substantial evidence. *See, e.g., City of Montrose,* 629 P.2d at 622; *Public Util. Comm'n v. City of Loveland,* 87 Colo. 556, 289 P. 1090 (1930). The substantial evidence standard requires a party challenging the findings and conclusions of the PUC to carry a heavy burden.

 Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," ... and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.

*National Labor Relations Bd. v. Columbian E. & S. Co., Inc.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939) (quoting *Consolidated Edison Co. v. National Labor Relations Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). *See generally* 5 K. Davis, *Administrative Law Treatise* § 29:5 (2d ed. 1984) (discussing substantial evidence standard). In my view, the PUC's findings and conclusions in this case are supported by substantial evidence.

10. Wendling's opinion that a modification in the amount of $24,084,126 was necessary was based on the staff's separation of demand functionalized costs and revenues. *See supra* note 5. The $24,084,126 is the sum of the total of the average demand portion as set forth in Exhibit 60 in the PUC hearing.

accurately track actual costs and are discriminatory because they cause some users to subsidize rates of other users. They argue that the modified rates (1) favor winter users and discriminate against summer users and (2) favor customers with fluctuating demand for electricity during the year and discriminate against those customers with relatively constant demand each year.

Section 40–3–102 provides that the PUC has authority "to prevent *unjust* discriminations" in rates, charges, and tariffs. (Emphasis added.) Section 40–3–106(1) states that "no public utility shall ... make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage" and that no utility "shall establish or maintain any *unreasonable* difference ... in any respect, either between localities or as between any class of service." (Emphasis added.) In *Mountain States Legal Foundation v. Public Utilities Commission*, 197 Colo. 56, 590 P.2d 495 (1979), we found a violation of section 40–3–106(1) when the PUC ordered utility companies to provide a lower rate to low-income elderly and low-income disabled persons that was *"unrelated to the cost or type of service provided." Id.* at 59, 590 P.2d at 498 (emphasis added).

In this case, the modification of the demand-energy formula is related to the actual costs of Colo–Ute to supply users and violates neither section 40–3–102 nor –106. On the contrary, the modification prevents non-peak users from subsidizing peak users and avoids the type of unjust discrimination raised by ARCO and Exxon. The unadjusted demand-energy rates endorsed by ARCO and Exxon discriminate against certain users since the rates do not accurately reflect Colo–Ute's costs. Competent evidence in the record supports the PUC's conclusion that the modified rates accurately reflect Colo–Ute's costs and therefore charge Colo–Ute's customers fairly.

Accordingly, I would reverse the district court and remand with directions to affirm the PUC.

I am authorized to say that Justice LOHR and Justice VOLLACK join in this dissent.